UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| NEXSTAR MEDIA, INC. d/b/a KFOR-TV; DYLAN BROWN; KEVIN JOSEFY; GAGE SHAW, | ) ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | Case No. CIV-24-980-J |
| RYAN WALTERS, State Superintendent of Public Instruction; DAN ISETT, Press Secretary for the Oklahoma State Department of Education, in their official and individual capacities, | ) ) ) ) ) ) ) | |
| Defendants. | ) | |

**ORDER**

Before the Court is Plaintiffs Nexstar Media, Inc., doing business as KFOR-TV, Dylan Brown, Kevin Josefy, and Gage Shaw's (collectively KFOR) Motion for Temporary Restraining Order and Preliminary Injunction. [Doc. No. 4]. KFOR filed its brief in support separately. (KFOR's Br.) [Doc. No. 5]. For the reasons that follow, KFOR's motion is granted to the extent it seeks a temporary restraining order (TRO). The Court will address KFOR's request for a preliminary injunction in a future order.

**I.  Background**

On September 23, 2024, KFOR filed suit against Oklahoma State Superintendent of Public Instruction Ryan Walters and Oklahoma State Department of Education Press Secretary Dan Isett. [Doc. No. 1].[1] The complaint, filed pursuant to 42 U.S.C. § 1983, alleges that Walters and Isett have violated KFOR's First Amendment rights by repeatedly denying its reporters access to

---

[1] All page citations refer to the Court's CM/ECF pagination.

Oklahoma State Board of Education (OSBE) meetings and subsequent press conferences held by Walters at the Oklahoma State Capitol complex—all because of KFOR's editorial stance. *See id.* at 2–14. Specifically, for meetings and press conferences held on March 28, June 27, July 31, and August 22, 2024—events open to credentialled news media—KFOR claims that its reporters, and its reporters alone, have been (1) relegated to an "overflow" room to watch the meetings via video feed, and (2) fully denied access to follow-up press conferences held by Walters. *See id.* KFOR seeks declaratory and injunctive relief to ensure its ability to attend future OSBE meetings and press conferences. *See id.* at 15–18. Walters and Isett have allegedly barred KFOR from these events on grounds that it is not a "legitimate" news organization, despite its credentials. *Id.* at 13.

Also on September 23, 2024, KFOR moved for a TRO and preliminary injunction to secure full access to upcoming OSBE meetings and press conferences, including those scheduled for September 26, 2024. *See* [Doc. Nos. 4, 5]. KFOR's motion was accompanied by written declarations detailing how its reporters were placed in overflow rooms and physically obstructed from attending press conferences, despite holding proper press credentials. [Doc. Nos. 4-1, 4-2]. The motion was also supported by video evidence showing instances of the same, including footage of KFOR reporters being denied entry to press conferences and being told that their organization lacked legitimacy. [Doc. Nos. 4-3, 4-4, 4-5]. The Court set the matter for a TRO hearing, [Doc. No. 9], which took place today with counsel for both sides present to argue their respective positions, [Doc. No. 13].

II.     **Legal Standard for a TRO**

In determining whether to grant a TRO, a court must analyze the following factors: (1) whether the movant has a substantial likelihood of success on the merits; (2) whether irreparable harm will ensue if the request for a TRO is denied; (3) whether the threatened injury outweighs

the harm that the TRO may cause the defendant; and (4) whether, if issued, the TRO will not adversely affect the public interest. *See Gen. Motors Corp. v. Urb. Gorilla, LLC*, 500 F.3d 1222, 1226 (10th Cir. 2007). "[I]n First Amendment cases, the likelihood of success on the merits will often be the determinative factor." *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1145 (10th Cir. 2013) (internal quotation marks omitted), *aff'd sub nom. Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014). Because a TRO "is an extraordinary remedy, the movant's right to relief must be clear and unequivocal." *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 269 F.3d 1149, 1154 (10th Cir. 2001).

### III. <u>Discussion</u>

#### A. **Likelihood of Success on the Merits**

The crux of KFOR's First Amendment challenge lies in its assertion that Walters and Isett have relegated KFOR, a credentialled news organization, to an overflow room for OSBE meetings and completely denied its access to follow-up press conferences, all because of its viewpoint. *See* KFOR's Br. at 6–29. "While newsgathering has some First Amendment protection, its protection does not necessarily include a right to access all news-worthy information." *Mocek v. City of Albuquerque*, 3 F. Supp. 3d 1002, 1056 (D.N.M. 2014). "It has generally been held that the First Amendment does not guarantee the press a constitutional right of special access to information not available to the public generally." *Branzburg v. Hayes*, 408 U.S. 665, 684 (1972) (collecting cases); *see also Smith v. Plati*, 258 F.3d 1167, 1178 (10th Cir. 2001) ("It is well-settled that there is no general First Amendment right of access to all sources of information within governmental control."). There is, then, "no basis for the claim that the First Amendment compels others— private persons or governments—to supply information." *Houchins v. KQED, Inc.*, 438 U.S. 1, 11 (1978). For instance, reporters "have no constitutional right of access to the scenes of crime or

disaster when the general public is excluded, and they may be prohibited from attending or publishing information about trials if such restrictions are necessary to assure a defendant a fair trial before an impartial tribunal." *Branzburg*, 408 U.S. at 684–85.

"Once [the State] has opened a . . . forum, however, the State must respect the lawful boundaries it has itself set." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995); *see also Ateba v. Jean-Pierre*, 706 F. Supp. 3d 63, 75 (D.D.C. 2023) (discussing the First Amendment's "protections when journalists are denied access to areas the government has specifically opened to the press"). "Recent [circuit] cases . . . have accepted the premise that the denial of a reporter's access to a press briefing is a cognizable First Amendment violation, reviewable in the traditional framework of a First Amendment forum and subject to an order requiring not only due process, but access." *Ateba*, 706 F. Supp. 3d at 76 (collecting cases); *see also John K. MacIver Inst. for Pub. Pol'y, Inc. v. Evers*, 994 F.3d 602, 611–12 (7th Cir. 2021) ("[First Amendment] forum analysis is not merely about who has the right to speak on government property. It also addresses who has the right of access to government property to engage in various expressive pursuits—whether that expressive pursuit is leafletting teachers, soliciting charitable donations, wearing political buttons at a polling place, or gathering information for news dissemination."). Indeed, the press may challenge those laws "hav[ing] a close enough nexus to expression, or to conduct commonly associated with expression, to pose a real and substantial threat of the identified censorship risks." *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 759 (1988).

"To determine when and to what extent the Government may properly limit expressive activity on its property, the Supreme Court has adopted a range of constitutional protections that varies depending on the nature of the government property, or forum." *Verlo v. Martinez*, 820

4

F.3d 1113, 1129 (10th Cir. 2016). "The Supreme Court has sorted government property into the following categories: traditional public forums, designated public forums, limited public forums, and nonpublic forums." *Pollak v. Wilson*, No. 22-8017, 2022 WL 17958787, at *1 (10th Cir. Dec. 27, 2022) (unpublished) (brackets and internal quotation marks omitted). KFOR maintains that it has been restricted from engaging in expressive activity within a limited public forum. KFOR's Br. at 21.

A limited public forum "exists where a government has reserved a forum for certain groups or for the discussion of certain topics." *Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 215 (2015) (brackets and internal quotation marks omitted). There, a government may restrict speech "so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral." *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 806 (1985); *see also Pryor v. Coats*, 203 F.3d 836, 2000 WL 147388, at *3 (10th Cir. Feb. 9, 2000) (unpublished table decision) (observing the Supreme Court's abandonment of "the strict scrutiny test in favor of a reasonableness standard [for limited public forums], requiring that the state show that its restrictions are reasonable in light of the purpose of the forum and that the restrictions are viewpoint neutral"). A restriction is viewpoint-based if it "denies access to a speaker solely to suppress the point of view he espouses on an otherwise includible subject." *Cornelius*, 473 U.S. at 806. "The reasonableness of the regulation of speech in a limited public forum is evaluated in light of the forum's purposes and 'all the surrounding circumstances.'" *People for the Ethical Treatment of Animals, Inc. v. Kan. State Fair Bd.*, 891 F. Supp. 2d 1212, 1227 (D. Kan. 2012) (quoting *Cornelius*, 473 U.S. at 809). "In conducting this inquiring, the court's purpose is simply to find a reasonable decision, and 'it need not be the most reasonable or the only reasonable limitation.'" *Id.* (quoting *Cornelius*, 473 U.S. at 809). "Reasonableness is a

5

relatively low bar," *NAACP v. City of Philadelphia*, 834 F.3d 435, 443 (3d Cir. 2016), but "requires something more than the toothless 'rational basis' test used to review the typical exercise of a state's police power," *Price v. Garland*, 45 F.4th 1059, 1072 (D.C. Cir. 2022).

With these standards in mind, and after considering all written submissions, evidence, and arguments presented at today's hearing, the Court finds that KFOR is likely to succeed on its First Amendment claim. "While the line between viewpoint-based and viewpoint-neutral content discrimination can be slippery," *Iancu v. Brunetti*, 588 U.S. 388, 418 (2019) (Sotomayor, J., concurring in part, dissenting in part) (internal quotation marks omitted), Defendants' conduct in barring KFOR from attending OSBE meetings and denying access to press conferences—while allowing other credentialed media to attend—appears largely motivated by the viewpoint of KFOR's publications. Though Defendants insisted today that the restrictions were imposed due to KFOR's repeated publication of "falsehoods," even vaguely referencing several instances in support,[2] the Court finds this justification to be little more than a ruse, masking an effort to punish a news organization for its editorial stance. This effort is particularly troubling given that the standards for what constitutes a "falsehood" appear arbitrary and are determined by the very officials who are the subject of KFOR's critical reporting. *See Forsyth Cnty. v. Nationalist Movement*, 505 U.S. 123, 130 (1992) ("A government regulation that allows arbitrary application is 'inherently inconsistent with a valid time, place, and manner regulation because such discretion has the potential for becoming a means of suppressing a particular point of view.'" (quoting *Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.*, 452 U.S. 640, 649 (1981)).

---

[2] There is no indication that Defendants have taken any steps to prosecute KFOR for these alleged "falsehoods."

Newsgathering is the lifeblood of free speech—the essential precursor to the dissemination of information and ideas that the public needs to form opinions, participate in democratic processes, and hold those in power accountable. Greenlighting a governmental attempt to restrict access to a limited public forum based on its unilateral determination that a news organization's reporting is factually untrue amounts to an unworkable standard. Such a standard, indeed, would empower the government to act as the final arbiter of truth, chilling investigative journalism and suppressing dissenting viewpoints. *See Ateba*, 706 F. Supp. 3d at 82 ("A rule limiting press access without objective, workable standards could encourage journalists to self-censor to obtain access, and shelter decisionmakers from accountability if they excluded reporters based on their comments."). The First Amendment has never permitted the government to silence the press simply because it disagrees with the content of its reporting.

### B. Irreparable Harm

The Court further finds that denying KFOR access to the upcoming OSBE meeting and press conference on September 26 would cause irreparable harm. When constitutional rights—particularly First Amendment rights—are at stake, the harm is inherently irreparable. The Supreme Court has acknowledged that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976).

### C. Harms and Public Interest[3]

Finally, the Court finds that the balance of harms favors KFOR and that a TRO does not disserve the public interest. On the one hand, KFOR faces the prospect of continued

---

[3] Elements three and four merge "when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

unconstitutional exclusion in violation of the First Amendment. On the other hand, allowing KFOR access imposes no discernible harm on Defendants, aside from those typically associated with free speech and press.

And "[i]t is always in the public interest to prevent the violation of a party's constitutional rights." *Pryor v. Sch. Dist. No. 1*, 99 F.4th 1243, 1254 (10th Cir. 2024) (internal quotation marks omitted). It is no coincidence that the very first of the constitutional amendments addresses the freedom of speech. The framers undeniably understood that, so long as there was government, there would be those in power seeking to subvert or suppress the people's right to criticize it. This country had just declared its independence from a monarchy hostile to free and open discussion. Therefore, despite creating a system of limited government and enumerated powers, the framers recognized then—as we do now—that the right to free speech is a fundamental prerequisite to the success of the republic. This, no doubt, is what separates this country from authoritative regimes, where government control over information and the press stifles public discourse and suppresses dissent.

## IV. Conclusion

For the reasons set forth herein, KFOR's Motion for Temporary Restraining Order and Preliminary Injunction [Doc. No. 4] is granted to the extent it seeks a TRO. State Superintendent Ryan Walters and Press Secretary Dan Isett, along with their officers, agents, and all persons acting under or in concert with them, are hereby ENJOINED, for 14 days from today's date, September 25, 2024, from (1) denying KFOR access to the room in which Oklahoma State Board of Education meetings are held; (2) barring KFOR from Walters' follow-up press conferences; and (3) physically obstructing or impeding KFOR's reporters when they attend these meetings or press conferences. No security bond is required under Federal Rule of Civil Procedure 65(c).

IT IS SO ORDERED this 25th day of September, 2024.

_____
BERNARD M. JONES
UNITED STATES DISTRICT JUDGE