## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

**NEXSTAR MEDIA, INC., d/b/a KFOR-TV, et al.,**

      *Plaintiffs*,

-v.-

**RYAN WALTERS**, in his official capacity
As Superintendent of Public Instruction,
And in his individual capacity, and

**DAN ISETT**, Director of Communication
for the Oklahoma State Department of Education,
in his official capacity,

      *Defendants*.

No. 5:24cv980-J

---

### DEFENDANTS' RESPONSE TO MOTION REQUESTING ATTORNEYS' FEES AND COSTS

---

By:

/s/ *Jacquelyne K. Phelps*
JACQUELYNE K. PHELPS
Oklahoma Bar No. 34366
Assistant General Counsel
Oklahoma State Department of Education
2500 N. Lincoln Blvd. Ste. 500
Tel: 405-521-2983
Cell: 405-464-3768
Email: Jacki.Phelps@sde.ok.gov

*Counsel for Defendants*

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................ i

TABLE OF AUTHORITIES ........................................................................ iii

DEFENDANTS' RESPONSE TO MOTION REQUESTING ATTORNEYS'
FEES AND COSTS ...................................................................................... 1

ARGUMENT ................................................................................................ 2

   I.   The Plaintiffs are not entitled to recover attorneys' fees or costs. ...................... 2

      A.  The Plaintiffs are not the class of persons to whom Congress intended 42
          U.S.C. § 1988 would apply. .................................................................. 2

      B.  The Plaintiffs cannot show that they are the "prevailing party" for purposes of
          awarding attorneys' fees. ...................................................................... 3

      C.  Even if the Court finds that the Plaintiffs are "prevailing parties," they are
          nevertheless not entitled to attorneys' fees. .......................................... 6

  II.  Even if the Court agrees that the Plaintiffs are entitled to attorneys' fees, the fees
      sought are unreasonable. ........................................................................... 7

      A.  The compensation the Plaintiffs seek is not "reasonable" as contemplated by
          42 U.S.C. § 1988(b). ............................................................................ 7

      B.  Even if the Court determines that the Plaintiffs are entitled to the lodestar, an
          enhancement is not warranted .............................................................. 10

          1.  The time and labor required: ..................................................... 11
          2.  The novelty and difficulty of the question presented: ................ 14
          3.  The skill requisite to perform the legal service properly: ............ 17
          4.  The preclusion of other employment by the attorneys due to accepting the
             case: ......................................................................................... 18
          5.  The customary fee: ................................................................... 19
          6.  Whether the fee is fixed or contingent: ..................................... 20
          7.  Any time limitations imposed by the client or the circumstances: ......... 21
          8.  The amount involved and the results obtained: ......................... 21
          9.  The experience, reputation, and ability of the attorneys: ............ 21
          10. The "undesirability" of the case: ............................................. 26

11. The nature and length of the professional relationship with the client:.....27

12. Awards in similar cases:..........................................................................28

III. The Defendants object to any award of costs, as Plaintiffs have not met their burden of proof to show necessity. .......................................................... 29

CONCLUSION ........................................................................................ 30

CERTIFICATE OF SERVICE ................................................................... 32

# TABLE OF AUTHORITIES

## Cases

*Ateba v. Jean-Pierre*, 706 F. Supp. 3d 63 (D.D.C. 2023). ..................................................... 16

*Awad v. Ziriax*, 670 F.3d 1111 (10th Cir. 2012) ................................................................. 23

*Bishop v. Smith*, 760 F.3d 1070 (10th Cir. 2014) ..........................................................23, 26

*Blackburn v. Webb*, No. 23cv379, 2024 WL 4607718 (W.D. Okla. Oct. 29, 2024) ........ 28

*Blue State Refugees, et al. v. Noem, et al.*, No. 3:21cv3024 (DSD 2022) .............................. 27

*Bond ex rel K.M. v. Friendship Public Charter School Board of Trustees*, No. 23cv8710370, 2023 WL 8710370 (D.D.C. Dec. 18, 2023) .......................................................................... 25

*Brown v. Flowers*, No. 17cv347, 2023 WL 2955883 (N.D. Okla. Apr. 14, 2023) ........... 28

*Calzone v. Hagan, et al.*, No. 2:16cv4278 (W.D. Mo. 2020) ................................................ 27

*Checkley v. Allied Property & Cas. Ins. Co.*, 635 Fed. App'x 553, 560 (10th Cir. 2016) ..... 5

*Cornelius v. NAACP Legal Defense & Educational Fund*, 473 U.S. 788 (1985) ................. 16

*Dahlem by Dahlem v. Board of Educ. Of Denver Public Schools*, 901 F.2d 1508 (10th Cir. 1990) ...................................................................................................................................... 6

*Farrar v. Hobby*, 506 U.S. 103 (1992) .....................................................................4, 5, 10, 29

*Fox v. Vice*, 563 U.S. 826 (2011) ............................................................................................ 6

*Fresh Vision, OP, Inc. et al., v. Skoglund, et al,.* No. 5:24cv4055 .................................... 13, 18

*Gays Against Groomers, et. al. v. Garcia, et. al.*, No. 1:24cv913 (D. Col.) ........................... 18

*Harrell ex rel. J.W. v. District of Columbia*, No. 23cv3611, 2023 WL 3640033 (D.D.C. Aug. 2, 2024) ............................................................................................................................... 25

*Hensley v. Eckerhart*, 461 U.S. 424 (1983). .................................................................6, 7, 10

*Hetherington v. Madden*, 3:21cv671 (N.D. Fla.) ............................................................... 8, 12

*Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974) ............................ 10

*Johnson v. Watkin, et al.*, No. 1:23cv848 (E.D. Cal.) ........................................................ 13

*Kentucky v. Graham*, 473 U.S. 159 (1985) .......................................................................... 4

*Louise Trauma Ctr., LLC v. United States Dept. of Homeland Security,* No. 1:20cv1128, 2023
     WL 3478479 (D.D.C. May 16, 2023) ........................................................................... 25

*Mama Bears, et al., v. Forsynth, et al.*, 2:22cv142 (N.D. Ga.) .................................................. 8

*McCraw et al. v. Oklahoma City, et al.*, No. 5:16cv352 (W.D. Okla.) ...................................... 23

*Moody v. NetChoice, LLC*, 603 U.S. 707 (2024) .................................................................... 22

*NetChoice LLC et al. v. Patton*, No. 21cv840 (W.D. Tex) ..................................................... 22

*Oliver v. FEC*, No. 3:24cv1166 (N.D. Ohio) (ECF Nos. 12, 14). ............................. 13, 18

*Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542 (2010) ......................................................passim

*Pollack v. Wilson*, No. 2:22cv49 (D. Wyo.), ECF No. 91. ....................................................... 9

*Riverside v. Rivera*, 477 U.S. 561 (1986) ....................................................................... 10, 29

*TGP Communications, LLC v. Sellers*, 642 F. Supp. 3d 957 (D. Az. 2022) .................. 15, 16

*Thomas v. Schroer*, No. 2:13cv2987 (W.D. Tenn.), ECF No. 462, ..................................... 12

*Webb v. Bd. Of Educ. Of Dyer Cty, Tenn.*, 471 U.S. 234 (1985) ........................................... 11

*Webster v. Sowders*, 846 F.2d 1032 (6th Cir. 1988) ............................................................. 6

*Wyoming Gun Owners v. Wyoming Secretary of State, et al.*, No. 2:21cv108 (D. Wyo.) .......... 9

## Statutes

18 U.S.C. § 3006A(d) ........................................................................................................... 19

42 U.S.C. § 1988(b) .......................................................................................................... 1, 7

## Other Authorities

Institute for Free Speech IRS Form 990 ................................................................. 1, 3, 8

Pitchbook, "Nexstar Media Group Overview," available at: https://pitchbook.com/profiles/company/12100-96 ................................................. 30

S. Rep. 94-1011, 1976 U.S.C.C.A.N. 5908, 1976 WL 14051 (Leg. Hist.) ....................... 2

Stock Analysis, "Nexstar Media Group, Inc. (NXST)," available at: https://stockanalysis.com/stocks/nxst/market-cap/ .................................................. 1

U.S. Courts, Judicial Policies, Chapter 2, § 230: Compensation & Expenses of Appointed Counsel, available at: https://www.uscourts.gov/administration-policies/judiciary-policies/guidelines-administering-cja-and-related-statutes-6#a230_16 ............................................................................................................. 20

U.S. Courts, Judicial Policies, Chapter 6, § 630: Compensation of Appointed Counsel in Capital Cases, available at: https://www.uscourts.gov/administration-policies/judiciary-policies/guidelines-administering-cja-and-related-statutes-19#a630_10 ............................................................................................................. 20

U.S. Dept. of Justice, "The Fitzpatrick Matrix," p.2, available at: https://www.justice.gov/usao-dc/page/file/1504361/dl?inline .............................. 24

**DEFENDANTS' RESPONSE TO MOTION REQUESTING ATTORNEYS' FEES AND COSTS**

Nexstar Media Group, Inc., is multi-billion dollar corporation whose net worth as of February 11, 2025, is $4.70 billion dollars.[1] While the Institute for Free Speech markets itself as a non-profit organization, its net assets at the end of 2023 reached $9,162,310.00.[2] Nevertheless, Nexstar and the Institute for Free Speech argue that this Court should order Oklahoma's tax payers to compensate them nearly $400,000 for a lawsuit that from start to finish lasted seventy-nine (79) days. To be exact, awarding the Plaintiffs the $366,044.60 they seek means awarding them $4,633.48 per day, or $1,544.49 per lawyer per day, for the 79 days spent litigating this case. That is an exorbitant sum that is woefully disproportionate to the time and skill required in this case.

More than that, 42 U.S.C. § 1988(b) was never intended to benefit billion-dollar corporate entities. Indeed, awarding a judgment in the Plaintiff's favor defies Congress's intent that Section 1988 "serves an important public purpose by making it possible for persons *without means* to bring suit to vindicate their rights." *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 559 (2010) (emphasis added).

---

[1]     Stock Analysis, "Nextstar Media Group, Inc. (NXST)," available at: https://stockanalysis.com/stocks/nxst/market-cap/ (last accessed Feb. 11, 2025).

[2]     Institute for Free Speech IRS 2023 Form 990, attached at Exhibit A.

1

For the reasons presented herein, defendants Ryan Walters, in his official capacity as Superintendent of Public Instruction, and Dan Isett, in his official capacity as Director of Communications for the Oklahoma State Department of Education ("OSDE"), respectfully submit this reply in opposition to awarding Plaintiffs' counsels' attorneys' fees and costs. It is the Defendants' position that the attorneys for the Institute for Free Speech (hereinafter, "IFS") are not entitled to recovery of attorneys' fees and costs. However, if the Court concludes that attorneys' fees and costs are appropriate, the Defendants respectfully request an evidentiary hearing to determine the appropriate amount.

## ARGUMENT

### I.    The Plaintiffs are not entitled to recover attorneys' fees or costs.

#### A.    The Plaintiffs are not the class of persons to whom Congress intended 42 U.S.C. § 1988 would apply.

When Congress passed 42 U.S.C. § 1988, it did so with the expressed purpose of providing "an essential remedy if *private citizens* are to have a meaningful opportunity to vindicate the important Congressional policies which [Titles II and VII] of the Civil Rights Act of 1964 [] contain." S. Rep. 94-1011, 1976 U.S.C.C.A.N. 5908, 1976 WL 14051 (Leg. Hist.), at * 5910 (emphasis added). The driving force behind the statute was the notion that "the citizen who must sue to enforce the law has little or no money with which to hire a lawyer." *Id.* Therefore, Congress sought to restore the balance of power by allowing "fee awards" as "an essential remedy if *private citizens* are to have a

meaningful opportunity to vindicate the important Congressional policies [civil rights] laws contain." *Id.* (emphasis added).

Noticeably absent from that language is any reference to awarding attorneys' fees when the plaintiff is a multi-billion dollar corporation which could certainly afford to hire any lawyer of its choosing. That is particularly true where, as here, the lawyers themselves receive six-figure salaries from a "non-profit" organization that reports $9,162,310.00 in total net assets as of 2023.[3]

Section 1988 "serves an important public purpose," but that purpose is not "to enrich attorneys[.]" *Perdue*, 599 U.S. at 599. Furthermore, any "attorney's fee awarded under this statute [would not be] paid by the individuals responsible" but instead "the fees [would be] paid in effect by state and local taxpayers[.]" *Id.* As such, that money would be diverted from "programs that provide vital public services." *Id.* That result is antithetical to Congress's intent and purpose for enacting Section 1988.

### B.    The Plaintiffs cannot show that they are the "prevailing party" for purposes of awarding attorneys' fees.

Although the Supreme Court uses a "generous formulation" of the term, a party can only be said to be a "prevailing party" "when actual relief *on the merits* of his claim materially alters the legal relationship between the parties by modifying the defendant's

---

[3]    *See* Institute for Free Speech 2023 IRS Form 990, attached at Exhibit A. IFS also reports compensation for Attorneys Miller and Corbello in the amounts of $131,120.00 and $109,554.00, respectively. That is a particularly high sum when considering that Attorney Miller did not even begin working for IFS until May of 2023 and Attorney Corbello did not begin working for IFS until April of 2023.

behavior in a way that directly benefits the plaintiff." *Farrar v. Hobby*, 506 U.S. 103, 109 (1992) (emphasis added) (internal quotation marks and citation omitted). In other words, "where a defendant has not been prevailed against, either because of legal immunity or on the merits, § 1988 does not authorize a fee award against that defendant." *Kentucky v. Graham*, 473 U.S. 159, 165 (1985). The Plaintiffs cannot and do not cite any authority that allows for attorneys' fees when no decision on any issue has been reached on the merits of any claim.

There is one issue on which both parties agree: The crux of this case, and indeed the *only* issue germane to either of the Plaintiffs' counts, was whether or not the Plaintiffs' First Amendment rights were violated. *See* ECF No. 1, pp. 15-17. The question of whether the Plaintiffs "prevailed" thus turns on whether the Plaintiffs receive any of their requested relief as relevant to either of these counts. The answer is simple and incontrovertible: The Plaintiffs did not.

The Plaintiffs' argument that they are the "prevailing party" does not have a modicum of traction because the Defendants did not admit to any violation of their First Amendment rights. No such Court finding is present in the Agreed Final Judgment and Permanent Injunction. Indeed, such a proposed finding was stricken by agreement of the parties. ECF No. 58. However, the Defendants did not, and do not admit to any such violation. What that means is that the Plaintiffs did not "obtain at least some relief *on the merits* of [their] claim." *Farrar*, 506 U.S. at 573 (emphasis added). Therefore, they are not "prevailing parties" and are not entitled to attorneys' fees.

To be sure, the Plaintiffs "obtained nominal damages" in the amount of $17.91. ECF No. 59, p.9. However, and contrary to Plaintiffs' contention, those nominal damages do not "reinforce[] their status as prevailing parties." *Id.* Indeed, Plaintiffs themselves stated that "$17.91 [] is a symbolic amount[,]"[4] which the Defendants paid as a reasonable value.

The reality is that this case was never about monetary relief. That much is evident from the original Complaint. To the contrary, the Plaintiffs case is rooted in the Plaintiffs' belief that their First Amendment rights were violated. The Plaintiffs cannot and do not point to any place in the record where the Defendants concede those claims, and the Court did not make any definitive finding. Therefore, they have not prevailed and are not entitled to fees. *See Checkley v. Allied Property & Cas. Ins. Co.*, 635 Fed. App'x 553, 560 (10th Cir. 2016) (unpublished) (affirming denial of attorneys' fees where the plaintiff did not prove "the substantial predicate of the claims.")

Finally, the fact that the Plaintiffs received a permanent injunction does not confer upon them "prevailing" status any more than does their "symbolic" money damages. As the Tenth Circuit explained, "[f]or purposes of deciding whether a plaintiff is a prevailing party," an injunction "is considered a decision on the merits so long as it 'represent[s] an unambiguous indication of probable success on the merits, and not

---

[4]    Kari King & Hunter Elyse, KFOR wins court battle with Oklahoma State Department of Education, Dec. 11, 2024, available at: https://kfor.com/news/local/kfor-wins-court-battle-with-oklahoma-state-department-of-education-over-first-amendment/ (last accessed Feb. 12, 2025).

merely a maintenance of the status quo.'" *Dahlem by Dahlem v. Board of Educ. Of Denver Public Schools*, 901 F.2d 1508, 1511 (10th Cir. 1990) (quoting *Webster v. Sowders*, 846 F.2d 1032, 1036 (6th Cir. 1988)). Here, the only relief the Plaintiffs gained largely maintained the status quo. In other words, this was not some historic win for Free Speech and First Amendment rights, "vindicating a policy that Congress considered of the highest priority." ECF No. 59, p.8 (quoting *Fox v. Vice*, 563 U.S. 826, 833 (2011) (internal quotation marks omitted). As such, the Plaintiffs are not prevailing parties and are not entitled to recovery of costs and fees.

### C.    Even if the Court finds that the Plaintiffs are "prevailing parties," they are nevertheless not entitled to attorneys' fees.

Even a prevailing party may not be entitled to an award of attorney's fees or costs. That is because "the extent of a plaintiff's success is a crucial factor in determining the proper amount of an award of attorney's fees under 42 U.S.C. § 1988." *Hensley v. Eckerhart*, 461 U.S. 424, 440 (1983). Here, "the relevant indicia of success" in this case "all point to a single conclusion": the Plaintiffs "only achieved a *de minimus* victory." *Farrar*, 506 U.S. at 579 (O'Connor, J., concurring). And, as "the Court correctly [held]," "the appropriate fee in such a case is no fee at all." *Id.*

To be sure, "an award of nominal damages can represent a victory in the sense of vindicating rights even though no actual damages were proved." *Id.* at 578. In those cases, courts "must look to other factors," one of which is "the significance of the legal issue on which the plaintiff claims to have prevailed." *Id.* Here, the Plaintiffs did not

"prevail" on any legal issue, regardless of whether they received an injunction. The Plaintiffs did not prove any specific or requisite monetary damages. In fact, and at best, the Plaintiffs were obtuse and evasive in detailing actual damages incurred. The Plaintiffs sought to prove that their First Amendment rights were being violated and in turn received nothing on that singular, central issue. In other words, the Plaintiffs "may have won a point, but the game, set, and match all went to the defendants." *Id.*

In short, this is precisely the "purely technical or *de minimis* [sic]" success wherein "no fees can be awarded." *Farrar*, 506 U.S. at 576. *See also Texas State Teachers Assn. v. Garland Independent School Dist.*, 489 U.S. 782, 792 (1989) (noting that "a technical victory may be so insignificant [] as to be insufficient" to support awarding attorneys' fees).

## II. Even if the Court agrees that the Plaintiffs are entitled to attorneys' fees, the fees sought are unreasonable.

Section 1988 provides that "the court, in its *discretion*, may allow a prevailing party, other than the United States, a *reasonable* attorney's fee as part of the costs." 42 U.S.C. § 1988(b) (emphasis added). Furthermore, "[t]he amount of the fee, of course, must depend on the facts of each case." *Hensley*, 461 U.S. at 429. As such, "the applicant bears the burden of establishing entitlement to an award and documenting the appropriate hours expended and hourly rates." *Id.* at 437. Here, the hourly rates and expenditures the Plaintiffs claim are not simply unreasonable—they border on being unconscionable.

### A. The compensation the Plaintiffs seek is not "reasonable" as contemplated by 42 U.S.C. § 1988(b).

As a threshold matter, the amount of compensation the Plaintiffs seek in this single case that spanned two (2) months and eighteen (18) days[5]—$366,044.60—falls just shy of the total amount of attorney's fees IFS reports in 2023 *for the entire year*.[6] In other words, the Plaintiffs would have this Court believe that the ninety-eight (98)[7] days of work expended in this matter is worth nearly the total IFS earned for the entire year in 2023. That is an absurd result, particularly when considering the fact IFS attorneys filed extremely similar pleadings and briefings in several cases.[8]

By way of comparison, the following examples are cases wherein IFS received agreed upon attorney's fees:

- *Hetherington v. Madden*, 3:21cv671 (N.D. Fla.)
  - This case was filed on April 15, 2021, with the final docket entry on April 27, 2023, representing litigation that spanned just over **two years**.
  - IFS requested attorneys' fees for three individuals, billed as follows:
  Owen Yeates: 486.6 hours at $400.00/hour
  Ryan Morrison: 30.6 hours at $400.00/hour
  Daniel Bean: 2.4 hours at $395.00/hour
  - IFS requested a total of $207.828.00, representing 519.6 hours over two years

---

[5]    The time frame from the initial filing to the Agreed Final Judgment, September 23, 2024, through December 11, 2024, is 79 days, or 2 months and 18 days.

[6]    *See* Institute for Free Speech 2023 IRS Form 990, p.9, attached at Exhibit A. IFS reports attorney's fees in the amount of $380,722.00 in 2023.

[7]    Although the "formal" litigation lasted 79 days (*see* n.5, *supra*), the Plaintiffs' time sheets state that they began their research on September 4, 2023. Therefore, Defendants give the Plaintiffs the benefit of the doubt that 98 days were spent in on this case.

[8]    *See, e.g.*, *Belin v. Nelson*, No. 4:24cv21 (S.D. Iowa), ECF No. 1 and *Utah Political Watch, Inc., et al v. Musselman, et al*, No. 2:25cv50 (D. Utah), ECF No. 2.

- The parties ultimately reached a settlement wherein they agreed to pay $175,000.00 in attorney's fees

- *Mama Bears, et al., v. Forsynth, et al.*, 2:22cv142 (N.D. Ga.)
  - This case was filed on July 25, 2022, with the final docket entry on March 24, 2023, representing litigation that spanned **nine months**.
  - Defendants **agreed** that "Plaintiffs' counsel are entitled to fees and costs" (ECF No. 44, p.3)
  - Defendants agreed to pay $107,500.00 in fees, and a symbolic $17.91 to be paid to Plaintiffs

- *Wyoming Gun Owners v. Wyoming Secretary of State, et al.*, No. 2:21cv108 (D. Wyo.)
  - This case was filed on June 1, 2021, with the final docket entry on February 13, 2024, representing litigation that spanned approximately **two years and eight months**.
  - Litigation also included a fully briefed and argued appeal to the Tenth Circuit Court of Appeals
  - The parties reached a settlement wherein the defendants agreed to pay $119,722.16 in attorneys' fees

Given these examples, it is impossible to determine the reasons behind why the Plaintiffs believe they are entitled to nearly $400,000.00. That is particularly true given the speed at which this case was resolved and the lack of substantive arugument on First Amendment issues. It is also difficult to determine why the Plaintiffs believe that (even when accounting for any inflation) they should be compensated at more than DOUBLE the rates IFS's own attorneys believed were proper.[9] In fact, as recently as January 9, 2025, IFS Attorney Brent Nolan, who, like Attorney Miller, holds the title of

---

[9]    The Plaintiffs provide a handful of citations referencing hourly rates for Oklahoma City attorneys at "between $250 and $475" but suggest that "[t]here has been additional inflation since then." ECF No. 59-1, p.20.

Senior Attorney, requested a rate of $400.00 per hour. *See Pollack v. Wilson*, No. 2:22cv49 (D. Wyo.), ECF No. 91.[10]

Perhaps the fact that other state defendants agreed to pay attorneys' fees as part of their settlements bears on the Plaintiffs' expectations. But expectations must be grounded in reality, and the reality of this case is that there is simply no possible justification for compensating IFS in the amount they request.

Finally, what the Plaintiffs fail to appreciate is that "fee awards under § 1988 were never intended to 'produce windfalls to attorneys[.]'" *Farrar*, 506 U.S. at 575 (quoting *Riverside v. Rivera*, 477 U.S. 561, 588 (1986)). Instead, they exist as a tool to level the playing field for those "without means" to be able to "vindicate" their rights. *Perdue*, 559 U.S. at 559. Those factors do not support awarding fees in this matter, particularly given the substantial fees the attorneys request.

### B.    Even if the Court determines that the Plaintiffs are entitled to the lodestar, an enhancement is not warranted.

A district court may enhance the lodestar where a review of the twelve factors outlined in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974), support doing so. *See also Hensley*, 461 U.S. at 430. Those factors include (1) the time and labor required; (2) the novelty and difficulty of the question presented; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment

---

[10]    As of February 16, 2025, the district court has not ruled on the motion for attorneys' fees.

by the attorneys due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) any time limitations imposed by the client or the circumstances; (8) the amount of time involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. *Johnson*, 488 F.2d at 717-19. Not a single one of those factors warrants a lodestar multiplier in the present case.

1.     **The time and labor required:**

As the Supreme Court has instructed, "an enhancement may be appropriate if the attorney's performance includes an extraordinary outlay of expenses and the litigation is especially protracted. *Perdue*, 559 U.S. at 554. Neither of those factors warrants a lodestar enhancement. Indeed, the facts of this case support a lodestar reduction, given the lack of substantive briefing on the merits and the exceptionally short duration of the case.

Taking the Plaintiffs at their word, they began research into this case on September 4, 2024. ECF No. 59-2, p.26. Litigation concluded and judgment was entered on December 11, 2024. That means that from start to finish, this case lasted 98 days, inclusive of the days Plaintiffs spent preparing the initial complaint and case opening documents. *See Webb v. Bd. Of Educ. Of Dyer Cty, Tenn.*, 471 U.S. 234, 242-43 (1985) (noting that "some of the services performed before a lawsuit is formally commenced before the filing of the complaint are perform 'on the litigation'" with the

"[m]ost obvious examples" being "the drafting of the initial pleadings and the work associated with the development of the theory of the case.")[11] The Plaintiffs contend that they collectively spent 532.65 hours on this case.[12] That equates to approximately 5.43 hours per day for *every* day between September 4, 2024, and December 11, 2024. It also means that the three attorneys for this case—for which the entirety of the litigation spanned 98 days—spent 13.05 hours ***more*** than did the three IFS attorneys in *Hetherington*, *supra*, wherein the litigation spanned more than ***two years***. That notion defies credibility.

In another example, IFS attorneys reported a combined 243 hours for litigating a case "that was first brought in December of 2013" and where "the record [was] voluminous and the legal questions complex." *Thomas v. Schroer*, No. 2:13cv2987 (W.D. Tenn.), ECF No. 462, pp. 4-5. There, litigation spanned nearly six years and included appellate briefing and a petition for a writ of certiorari to the Supreme Court. While it appears from the record that IFS attorneys only represented the plaintiffs on appeal, that nevertheless included nearly five years' worth of previous filings, substantial briefing, and oral argument, preparation for which no doubt required many hours. By

---

[11]     Contrary to the facts of the instant case, *Webb* assumes substantive work involved in drafting the original pleading and complaint due to the novel issues. That factor is not present in this case, as the original complaint appears to be an almost exact copy of previously drafted pleadings (see n.8, *supra*).

[12]     *See* Affidavit of Courtney Corbello, ECF No. 59-1, p.31 (totaling 321.2 hours); Affidavit of Charles Miller, ECF No. 59-2, p.30 (totaling 149.05 hours); Affidavit of Robert Nelon, ECF No. 59-3, p.8 (totaling 62.4 hours).

comparison, it seems preposterous that the attorneys in this case required more than double that amount of time.

To be sure, the Defendants do not suggest that the IFS attorneys are purposefully inflating the number of hours they expended. As officers of the Court, it is assumed that their affidavits have been provided truthfully and to the best of their knowledge and belief. However, attorneys cannot and should not be monetarily rewarded for their own inability to effectively manage their time.

Plaintiffs also point out the number of times they had to travel to Oklahoma City as warranting fees and costs for time and money spent traveling. Yet Plaintiffs offer no explanation as to why they could not, or did not, motion the Court to allow them to appear telephonically or by video conference, or, in the alternative, utilize local counsel that was also retained in this case.

As part of a firm that handles federal cases nationwide, the Plaintiffs are well-aware that courts often grant such motions, and for these very reasons. For example, in *Johnson v. Watkin, et al.* (Attorney Corbello representing the Plaintiff as counsel for IFS), the parties were ordered appear via Zoom four times. No. 1:23cv848 (E.D. Cal.) (ECF Nos. 32, 68, 81, 84, 87). In *Fresh Vision, OP, Inc. et al., v. Skoglund, et al.* (Attorneys Corbello and Miller representing the Plaintiff as counsel for IFS), hearings were conducted via Zoom. No. 5:24cv4055 (ECF No. 41). In *Oliver v. FEC* (Attorneys Corbello and Miller representing the Plaintiff as counsel for IFS), counsel conducted

case management and discovery conferences via telephone before the case was ultimately dismissed. No. 3:24cv1166 (N.D. Ohio) (ECF Nos. 12, 14).

In short, the Plaintiffs knew that they could have (and perhaps should have, given the time constraints)[13] moved the Court for permission to appear remotely. They chose not to do so. Therefore, the Plaintiffs should not be entitled to recover any fees related to time and travel.

Should the Court agree that the Defendants are entitled to recover fees and costs, the Defendants request an evidentiary hearing to allow the Plaintiff to further explain why this litigation required such a substantial amount of time, and why the Plaintiffs were not able to mitigate any of the costs. Of course, the Defendants consent to any request that the Plaintiff's counsel would make to appear remotely, should the Court order an evidentiary hearing.

### 2.    The novelty and difficulty of the question presented:

Despite the Plaintiffs contention, there is nothing new or "novel" about this case. As any former client of IFS who won a framed check and an injunction will attest, free speech claims have been around since 1791. The Plaintiffs have not offered the Court

---

[13]    Attorney Corbello notes that "[i]mmediately following the filing of the Plaintiffs' suit, the Court ordered a TRO hearing to be held the next day. This required Mr. Miller and [herself] to delay matters in other cases in order to book plane tickets and make [their] way to Oklahoma City." ECF No. 59-1, p.5. Perhaps a better idea would have been to request to appear remotely as she had done in other cases, given the pressing timeline.

any argument relevant to why this *particular* case was novel or complex. Instead, they offer only generalized statements regarding First Amendment litigation as a whole.

As with most of his Affidavit, rather than addressing the novelty or difficulty of this specific case, Attorney Miller simply addresses the difficulty of First Amendment cases in general. ECF No. 59-2, pp.13-14 (discussing generally attorneys who "[h]and[e] these cases as dedicated practice"). As to the novelty, Attorney Miller states that "[i]t is a whole lot to wade through, and can be 'novel' to many who are uninitiated." *Id.* at p.13. Of course, if Attorney Miller counts himself among the "uninitiated," then perhaps the issues presented herein are novel to him. However, if that is true, then Attorney Miller cannot be compensated at the rates he requests, because he fails the third and ninth *Johnson* factors (discussed further, *infra*).

Attorney Corbello also fails to explain why this specific case was particularly novel or complex. Instead, her argument rises and falls with the idea that "press access cases in Oklahoma are not plentiful by any means." ECF No. 59-1, p.7. The problem with that logic is that even assuming *arguendo* that is true, that does not mean that press access cases do not exist.

For example, in *TGP Communications, LLC v. Sellers*, the district court rejected the plaintiffs' argument that "the denial of a press pass [] was impermissibly content and viewpoint based" and that the plaintiffs "were selectively treated based on the content and viewpoint of their speech in contravention of equal protection principles." 642 F. Supp. 3d 957, 964 (D. Az. 2022). There, a reporter "applied for credentials to attend

press conferences" and "to access certain county facilities." *Id.* at 961. The county denied the application, informing the plaintiff that he did was "not a bona fide correspondent of repute" and did not "seek the truth" in his reporting. *Id.* at 962. The county added that the press conference would be "streamed via YouTube" and the plaintiff was "welcome to view it." *Id.* at 963.

The court ultimately agreed that the county's restrictions were "reasonably related" to the "further the County's legitimate interest in disseminating accurate information to the public." *Id.* at 969. The court added that such restrictions serve to "increas[e] journalistic integrity by favoring media that avoid real or perceived conflicts of interest or entanglement with special interest groups, or those that engage in advocacy or lobbying." *Id.* Finally, the court noted that "press-pass restrictions 'need only be *reasonable*; [they] need not be the most reasonable or the only reasonable limitation.'" *Id.* (quoting *Cornelius v. NAACP Legal Defense & Educational Fund*, 473 U.S. 788, 808 (1985) (emphasis in *Cornelius*).

Similarly, *Ateba v. Jean-Pierre*, the plaintiff argued that changes to the White House press access policy "facially violat[ed] the First Amendment," because it was "unreasonable[.]" 706 F. Supp. 3d 63, 79 (D.D.C. 2023). The court disagreed, noting that "[t]he First Amendment does not demand unrestricted access to a nonpublic forum merely because use of that forum may be the most efficient means of delivering the speaker's message." *Id.* at 81 (quoting *Cornelius*, 473 U.S. at 809) (internal quotation

marks omitted). The court ultimately granted summary judgment to the defendants on two of the plaintiffs claims and dismissed a third. *Id.* at p.91.

What these example cases show is that the questions presented in this case are not new or "novel" in any respect. Nor was this litigation complex in any way. The Plaintiffs have simply not offered any evidence supporting their claims that fees are warranted, much less any lodestar multiplier of fees.

### 3.    The skill requisite to perform the legal service properly:

Concerning the third *Johnson* factor, the Plaintiffs' affidavits are telling for what they do *not* say. Noticeably absent from the Affidavits of Attorneys Miller and Corbello is any information about why they possess any unique skill or experience particular to this case. Instead, they offer the Court broad statements about skill in general. That is a far cry from offering evidence of their particular skill sets that apply to this *specific* case.

For example, Attorney Corbello devotes eight paragraphs to waxing poetic about general skills any competent lawyer should have, including planning case strategies, identifying important documents, and something about digging ditches (the analogy of which, sadly, is lost on the undersigned). ECF No. 59-1, pp. 9-11. She then gives the Court a snapshot of her resume, none of which has anything to do with her experience in litigation First Amendment claims (save for cases that are pending as of her joining IFS in April of 2023). *Id.* at pp. 14-16.

While Attorney Miller undoubtedly has many years of legal experience, none of that experience pertains to First Amendment cases. In addressing this factor, Attorney

Miller provides a terse two-paragraph summary regarding obtaining a TRO and filing a motion in limine. ECF No. 59-2, p.14. Those are not skills unique to First Amendment litigation. Attorney Miller also notes that the case resulted in "an agreed injunction[.]" *Id.* That is not a testament to his skill so much as a testament to the Defendants' desire to end the litigation quickly.

Finally, the Plaintiffs contend that a lodestar multiplier is warranted because the stipulated injunction gave "additional relief beyond what was sought." ECF No. 59, p.4. However, the Supreme Court has made it clear that "unanticipated defense concessions, unexpectedly favorable rulings," "or simple luck" cannot "justify an enhanced award[.]" *Perdue*, 559 U.S. at 554.

In short, the Plaintiff do not provide the Court with any concrete examples evincing evidence of "superior performance" warranting the fees they seek.

### 4. The preclusion of other employment by the attorneys due to accepting the case:

The Plaintiffs claim that this case precluded other employment. However, A PACER search reveals that those statements are erroneous. During the time period between September 23, 2024 (the initial filing) and December 11, 2024 (Final Judgment entered), a PACER attorney search shows Attorneys Corbello and/or Miller entered appearance and were actively litigating at least three (3) cases. (*Gays Against Groomers, et. al. v. Garcia, et. al.*, No. 1:24cv913 (D. Col.) (filing date April 4, 2024; closed date November 27, 2024); *Fresh Vision OP, Inc., et al v. Skoglund, et al.*, No. 5:24cv4055 (D.

Kan.) (filing date June 6, 2024; closed date January 3, 2025); *Oliver, et al v. FEC*, No. 3:24cv1166 (N.D. Ohio) (filing date July 11, 2024; closed date November 22, 2024)). Therefore, including the instant case, these attorneys were involved with litigation in four (4) suits. That is actually a substantial amount, given their own claim that "IFS is a relatively small organization." ECF No. 59-1, p.11.

It is also telling that Mr. Miller fails to address this point in any respect. Instead, he simply states that "[t]here is a limited number of cases we can handle at a given time" and "undertaking the representation here blocked our ability to take on similar cases simultaneously." ECF No. 59-2, p.14. Attorney Corbello fares no better, stating that "[o]f course, other employment was precluded when undertaking this case." ECF No. 59-1, p.11. She goes on to claim that during the time frame of this case, they "were required to tell other inquiring litigants that their case either could not be taken at all, or would need to wait." *Id.*

We know from PACER and from these attorneys' own affidavits that that is not true. In fact, Attorney Corbello actually lists other IFS cases in which she is involved, including cases she has taken before, during, and after the time frame of this case. ECF No. 59-1, p.17. In short, the indisputable facts contradict any notion that IFS was precluded from taking other cases.

### 5.    The customary fee:

There is not a "customary" fee associated with Section 1988 attorney fee awards. However, we know, and the Plaintiffs agree, that the purpose of Section 1988 is to

provide legal counsel for the indigent or disadvantaged, thereby allowing them to bring civil rights claims. As such, we can look to another statute that also applies to the indigent or disadvantaged for guidance.

The Criminal Justice Act (CJA), 18 U.S.C. § 3006A(d), is another statute that provides for attorney fees for representation of the disadvantaged. Fortunately, the CJA also provides specific hourly rates for attorneys. In 2024, attorneys representing clients under the CJA were paid $172.00 per hour, with maximum compensation capped at $13,600.00.[14] In death penalty cases, the hourly rate in 2024 was $220.00, with no maximum compensation.[15]

Congress believes that $172-220 per hour is a reasonable rate to compensate attorneys, regardless of level of experience, when people's lives are literally at stake. Therefore, it makes sense to conclude that the same compensation is reasonable, given the analogous congressional intent that Section 1988 would be a means of providing counsel for the less fortunate.

### 6.    Whether the fee is fixed or contingent:

---

[14]    U.S. Courts, Judicial Policies, Chapter 2, § 230: Compensation & Expenses of Appointed Counsel, available at: https://www.uscourts.gov/administration-policies/judiciary-policies/guidelines-administering-cja-and-related-statutes-6#a230_16 (last accessed Feb. 15, 2025).

[15]    U.S. Courts, Judicial Policies, Chapter 6, § 630: Compensation of Appointed Counsel in Capital Cases, available at: https://www.uscourts.gov/administration-policies/judiciary-policies/guidelines-administering-cja-and-related-statutes-19#a630_10 (last accessed Feb. 15, 2025).

As the Plaintiff's counsel agreed to take this case *pro bono*, the sixth *Johnson* factor does not apply.

**7.    Any time limitations imposed by the client or the circumstances:**

Any time limitations in this case were the ones the Plaintiffs themselves imposed. As Attorney Corbello notes, "Mr. Miller and [herself] persuaded defense counsel to begin the discovery period immediately, have discovery last only 2 months, and go to trial in 3 months[.]" ECF No. 59-1, p.5. In other words, the Plaintiffs asked for expedited litigation, and the Plaintiffs received expedited litigation.

**8.    The amount involved and the results obtained:**

As discussed in part I(B), *supra*, this case was never about monetary damages. Instead, it was about whether the Plaintiffs' First Amendment free press violations were being violated. While the Plaintiffs claim they were awarded "additional relief beyond what was sought," that does not change the fact that they did not prevail on the central issue. ECF No. 59, p.4.

**9.    The experience, reputation, and ability of the attorneys:**

The ninth *Johnson* factor requires attorneys seeking fees to give concrete evidence of their personal experience and ability as relevant to the facts and issues of the case at hand. The ninth *Johnson* factor does *not* ask attorneys to provide the Court generalizations.

Attorney Miller's Affidavit provides no insight as to why he *personally* is entitled to the fees requested, stating only that his "reputation and abilities are well-known,

which is why a local tv station in Oklahoma City would call [him] when the need arose." ECF No. 59-2, p.15. It is respectfully submitted that likely occurrence of events is that the billion-dollar parent company of the local tv station called The Institute for Free Speech and not Charles "Chip" Miller *personally.*

In fact, Attorney Miller addresses this *Johnson* prong with a single paragraph stating that he is "a 24-year attorney with experience as a judge, big firm partner, and high-level government attorney." ECF No. 59-2, p.15. Attorney Miller cannot, and indeed does not, offer a single case wherein he successfully litigated any First Amendment issues to conclusion and absent settlement such as would make him any authority in that area of law.

Attorney Corbello at least makes a passing attempt to provide the Court with examples of her First Amendment litigation experience and ability. However, nearly every example she provides stems from her employment with IFS. Since most of these cases are still pending, it is impossible to make any arguments relating to why her fees are appropriate, given her level of skill. Simply being part of First Amendment litigation is far removed from being part of *successful* litigation. That difference sets her apart from litigators in this area, but not in the way she would like to admit.

For example, she references *NetChoice LLC et al. v. Patton*, No. 21cv840 (W.D. Tex), and correctly notes that "the Supreme Court recently rendered a decision" in that case." ECF No. 59-1, p.17 (referencing *Moody v. NetChoice, LLC*, 603 U.S. 707 (2024). What Attorney Corbello does *not* mention is that she represented the state, and that the

state's position was overturned in *Moody*. *See Moody*, 603 U.S. at 741 ("But a state may not interfere with private actors' speech to advance its own vision of ideological balance.")

Attorneys Miller and Corbello do not point to a single IFS case that they themselves litigated that concluded with a decision on the merits in their favor. Instead, it appears as though the majority of defendants in these cases choose to settle, paying their symbolic $17.91 for the courtesy of being left alone. Moreover, the fact that Attorneys Miller and Corbello did not even begin dedicated First Amendment practice until they joined IFS midyear of 2023 contradicts any claim that they have the extensive experience and abilities that they claim.

Finally, Attorneys Miller and Corbello state numerous times that "there are few, if any" "highly skilled attorneys in Oklahoma City" "who have the level of experience and specialized knowledge" that they possess. ECF No. 59, p.12. In fact, they go so far as to contend that "there are **no** local attorneys with similar experience in this area of law." *Id.* (emphasis added). The wide net they cast for that presumption must have even wider holes. One of the foremost and most respected First Amendment litigators in the country happens to live and work right here in Oklahoma City.

As an example of a declaration outlining qualifications for attorney's fees in a First Amendment case, the Defendants attach as Exhibit B the Declaration of Professor Joseph Thai, a *cum laude* Harvard Law graduate who served as Clerk to Justices John

Paul Stevens and Byron White.[16] Prof. Thai has taught First Amendment, Constitutional Law, and Supreme Court Theory and Practice for over two decades. A very short list of his successful First Amendment cases includes *Bishop v. Smith*, 760 F.3d 1070 (10th Cir. 2014) (striking down a ballot-enacted constitutional ban on same-sex marriage a year before the Supreme Court held the same in *Obergefell v. Hodges*, 576 U.S. 644 (2015)), *Awad v. Ziriax*, 670 F.3d 1111 (10th Cir. 2012) (successful First Amendment challenge to the first anti-Muslim law in the country following the 9/11 attacks); *McCraw et al. v. Oklahoma City, et al.*, No. 5:16cv352 (W.D. Okla.) (striking down Oklahoma City ordinance on First Amendment grounds that prohibited standing, sitting, or staying on any public median).[17] There is no evidence that the Plaintiffs contacted Prof. Thai or any of the other First Amendment litigation specialists with whom he often collaborates. Therefore, they cannot say that there are "no" First Amendment litigators in Oklahoma, which is why Nexstar had no choice but to contact IFS.[18]

---

[16]    This Declaration was provided in support of awarding attorneys' fees in Case No. 5:16cv352, (W.D. Okla.), ECF No. 352. The Defendants use this Declaration as an example with Prof. Thai's expressed consent, obtained February 19, 2025.

[17]    What is more, despite having decades of experience in First Amendment litigation with real, tangible, law and life-changing effects, Prof. Thai bills at an hourly rate of $500.00. (Declaration, Exhibit B, p.12). That makes it all the more puzzling as to why the IFS attorneys believe their "skill" merits "$655 for Ms. Corbello and $812 for Mr. Miller—and Mr. Nelon's rate of $575/hour." ECF No. 59, p.8.

[18]    It also bears mentioning that local counsel for the Plaintiffs, Bob Nelon, appears from his own Declaration to have a significant background in media First Amendment rights and in litigation involving press speech First Amendment cases. That wholly

Finally, the Plaintiffs rely on the "Fitzpatrick Matrix" to justify the substantial fees they seek. ECF No. 59-2, p.17. It bears mentioning that since none of these attorneys actually lives or works in Washington, D.C., it defies belief that they believe they should be compensated at Washington, D.C., rates. Additionally, the Matrix does not apply to this situation and "has not been adopted by the Department of Justice generally for use outside the District of Columbia, nor has it been adopted by other Department of Justice components."[19] That is because the Matrix applies to "matters of *complex* federal litigation" encompassing "a broad range of matters tried in federal court."[20] In other words, while the Matrix does not delineate between district court, appellate court, or Supreme Court cases, it does assume lengthy and complex court battles. The Plaintiffs have not proffered any compelling evidence that this case is the type of "complex" litigation to which the Fitzpatrick Matrix purports to apply. *See Louise Trauma Ctr., LLC v. United States Dept. of Homeland Security,* No. 1:20cv1128, 2023 WL 3478479, at *4 (D.D.C. May 16, 2023) (denying Fitzpatrick Matrix rates because the plaintiff made "little effort to show that th[e] case was especially complex" and noting that "the [c]ourt doubts that it [was]); *Bond ex rel K.M. v. Friendship Public Charter School Board of Trustees,* No. 23cv8710370, 2023 WL 8710370, at *5-6 (D.D.C. Dec. 18, 2023)

---

contradicts the IFS attorneys' claims that there are "no" attorneys in all of Oklahoma with First Amendment litigation experience.

[19]    U.S. Dept. of Justice, "The Fitzpatrick Matrix," p.2, available at: https://www.justice.gov/usao-dc/page/file/1504361/dl?inline (last accessed Feb. 15, 2025).

[20]    *Id.* (emphasis added).

(denying Fitzpatrick Matrix fees "because [p]laintiff has not met the burden of demonstrating complexity"); *Harrell ex rel. J.W. v. District of Columbia*, No. 23cv3611, 2023 WL 3640033, at *5 (D.D.C. Aug. 2, 2024) (finding that the plaintiffs could "not prove the reasonability" of Fitzpatrick Matrix rates and noting that the case was "not particularly complex").

So too here, the Plaintiffs have not met their burden to show why this case was so complex as to merit applying Fitzpatrick Matrix fees, nor have they provided any evidence support why those fees are reasonable. Indeed, the attorneys cannot point to a single instance in any case wherein a court agreed that they are entitled to those fees.[21]

### 10.    The "undesirability" of the case:

The "undesirability" factor is where the Plaintiffs utterly fail to make their case. "Undesirability" as contemplated by the caselaw refers to cases that are generally met with public resistance or outcry. For example, in *Bishop*, the attorneys were met with widely sweeping public resistance, as they advocated to overturn an amendment to the Oklahoma Constitution banning same-sex marriages—a provision which "state voters passed [] by a margin of [] 76%." No. 04cv848, ECF No. 299, p.22. It was a case that "promised neither success, payment, nor popularity, but instead carried substantial risk of loss of time, opportunity, and reputation." *Id.* at p.23.

---

[21]    By contrast, Prof. Thai's Declaration contains numerous examples of courts both in the Western District of Oklahoma and nationally that have agreed to his requested hourly rates. *See* Declaration, Exhibit B, pp. 10-12.

In an effort to salvage their position, the Plaintiffs once again make generalized statements about the "undesirability" of First Amendment litigation as a whole. The Affidavits of Attorneys Miller and Corbello contain identical language stating that "the 'undesirability' is reinforced by the fact that so few lawyers in Oklahoma take these cases." ECF No. 59-1, p.18; ECF No. 59-2, p.16. The problem is that even if that were true, that is not what the "undesirability" prong means. Instead, what the Plaintiffs should have done, and did not do, is provide the Court with examples of why this *specific* case has any "undesirable" quality. This Plaintiffs did not do so, presumably because they could not do so.

In reality, this is the polar opposite of an "undesirable" case. Here, we have a case involving a Superintendent of Public Instruction who, whether one agrees with his policies or not, is indisputably one of the (if not the) most recognizable public figures in the state, and indeed in the country. The Superintendent is no stranger to criticism and public disagreement. In other words, these Plaintiffs were never going to face the criticism or public backlash that the "undesirability" factor intends to address, and the Plaintiffs make no attempt to suggest that they would have.

11. **The nature and length of the professional relationship with the client:**

While the Defendants cannot speak to the nature of the professional relationship between IFS and Nexstar, the length of relationship speaks for itself. Taking the record

in the light most favorably to the Plaintiffs, the professional relationship spanned 98 days.

**12.    Awards in similar cases:**

There is a very simple reason why Attorneys Corbello and Miller cannot give the Court concrete examples of cases wherein they were awarded their requested fees in similar cases. It is because it appears as though Attorneys Miller and Corbello have never been awarded fees in First Amendment cases.

However, because other IFS attorneys have been awarded fees, as a means of comparison, the Defendants respectfully provide these examples of attorney fee awards IFS attorneys have received in the past, omitting attorney fees that were agreed upon via settlement.

- *Calzone v. Hagan, et al.*, No. 2:16cv4278 (W.D. Mo. 2020): IFS asked for $68,187.50; received $22,440.00 (ECF No. 64). Notably, this litigation commenced on October 16, 2016, and concluded on March 11, 2020, thereby lasting **1,242 days**—or 1,144 days longer than the litigation in this case.

- *Blue State Refugees, et al. v. Noem, et al.*, No. 3:21cv3024 (DSD 2022): IFS asked for $38,656.00; received $16,660.10 (notably, the court found that the fees requested were "out of proportion to the short duration of the case" and that "the fees sought [were] excessive for the legal issues presented in this short-lived case.") (ECF No. 41).

Additionally, the following is a brief list of attorney fee rates awarded in Oklahoma under Section 1988:

- *Blackburn v. Webb*, No. 23cv379, 2024 WL 4607718, at *5 (W.D. Okla. Oct. 29, 2024) (finding that "an hourly rate of $352.00 [was] reasonable);

- *Briggs as next friend of T.W. v. Friessen*, No. 23cv81, 2023 WL 103204, at *7 (N.D. Okla. Jan. 15, 2025) (finding that $325.00 per hour was a "reasonable hourly rate[] in the Tulsa market");

- *Brown v. Flowers*, No. 17cv347, 2023 WL 2955883, at *4 (N.D. Okla. Apr. 14, 2023) (finding that "a rate of $325 per hour [was] appropriate" for "an experienced litigator with 23 years of litigation under his belt").

What these cases show is that the Plaintiffs' proposed hourly rates are grossly disproportionate to awards in similar cases, and they have offered no compelling reasons as to why they should be compensated at these rates.

## III.    The Defendants object to any award of costs, as Plaintiffs have not met their burden of proof to show necessity.

Because the Plaintiffs have not met their burden to show that obtaining out of state counsel was necessary, the Defendants object to any award of costs in this case. More specifically, the Defendants object to the following costs as unnecessary to the litigation, as outlined in Plaintiffs' Exhibit C, ECF No. 59-1, p.33:

- *Pro Hac Vice* fees for Attorneys Miller and Corbello, as counsel has not met its burden to show why local counsel could not have handled this litigation
- UPS receipt for mailing hard copies to the Court, as UPS delivery was not necessary
- All costs related to travel, meals, and lodging for the TRO hearing, as counsel did not provide any evidence as to why they could not have appeared remotely
- Upgraded seat purchases and inflight wifi for Attorney Miller, as these are luxury purchases and unnecessary, even if travel was necessary
- All costs related to travel, meals, and lodging for deposition hearing, as counsel did not provide any evidence as to why depositions could not have been conducted remotely
- All costs related to travel, meals, and lodging for trial and eventual settlement, as counsel has not met their burden to show why local counsel could not have handled this matter

29

- Transcript copies of depositions that were purchased after the litigation concluded (depositions of Dylan Brown, Kevin Josefy, and Gage Shaw)

If the Court agrees that awarding any costs is merited, the Defendants respectfully request an evidentiary hearing on what, if any, of these costs were reasonable and necessary for this case.

## CONCLUSION

Section 1988 "is not a relief Act for lawyers." *Riverside*, 477 U.S. at 588 (Renquist, J., dissenting). Rather, "it is a tool that ensures the vindication of important rights, even when large sums of money are not at stake[.]" *Farrar*, 506 U.S. at 578. That vindication did not happen here. A symbolic monetary judgment and an injunction absent any admission that any rights were violated "teaches no valuable lesson because it carries no discernable meaning." *Id.* Indeed, absent any admission that any fundamental rights have been violated, "[s]uch a judgment cannot deter misconduct any more than a bolt of lightning can." *Id.*

The Plaintiffs' own motion makes the best argument for why attorneys' fees should *not* be awarded in this case. As the Plaintiffs correctly note, "[Section] 1988(b) was put in place to encourage [] competent attorneys [] to help the disenfranchised, the marginalized, and the powerless[.]" ECF No. 59, p.8. Here, the Plaintiffs are *not* disenfranchised. The Plaintiffs are *not* marginalized. The Plaintiffs are certainly not "powerless." On the contrary, this is a highly powerful Plaintiff who is extremely wealthy. Nexstar is "the largest television station owner-operator in the United States

with over 200 stations in 116 markets."[22] Nexstar is "the top broadcaster for both Fox and CBS as well as the number two partner for NBC and number three for ABC."[23] In other words, Nexstar does not now, nor will it for the foreseeable future, require anyone to give it a voice or a platform with which to speak on its issues. Respectfully, if Nexstar truly believes its counsel is entitled to $366,044.60 in attorneys' fees and $10,550.14 in costs, then perhaps it should dig deep into the recesses of its billion-dollar couch cushions to unearth that pocket change and give it to them. At the bottom line, even if the Court firmly agrees with the Plaintiffs' First Amendment claims, Oklahoma's taxpayers should not be the innocent bystander victims, forced to bear the costs of any sins of the sovereign.

Respectfully Submitted,

/s/ *Jacquelyne K. Phelps*

JACQUELYNE K. PHELPS
Oklahoma Bar No. 34366
Assistant General Counsel
Oklahoma State Department of Education
2500 N. Lincoln Blvd. St. 500
Oklahoma City, OK 73105

*Counsel for Defendants*

---

[22]    Pitchbook, "Nexstar Media Group Overview," available at: https://pitchbook.com/profiles/company/12100-96 (last accessed Feb. 17, 2025).
[23]    *Id.*

31

## CERTIFICATE OF SERVICE

The undersigned, Jacquelyne Phelps, an attorney with the Oklahoma State Department of Education, hereby certifies that on February 21, 2025, I filed the foregoing with the Clerk of the Court using the CM/ECF system.

Respectfully Submitted,

/s/Jacquelyne K. Phelps
JACQUELYNE K. PHELPS
Oklahoma Bar No. 34366
Assistant General Counsel
Oklahoma State Department of Education
2500 N. Lincoln Blvd. Ste. 500
Tel: 405-521-2983
Email: Jacki.Phelps@sde.ok.gov

*Counsel for Defendants*

32