## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| NEXSTAR MEDIA, INC. d/b/a KFOR-TV; | ) | |
| DYLAN BROWN; KEVIN JOSEFY; | ) | |
| GAGE SHAW, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. CIV-24-980-J |
| | ) | |
| RYAN WALTERS, State Superintendent of | ) | |
| Public Instruction; DAN ISETT, Press | ) | |
| Secretary for the Oklahoma State Department | ) | |
| of Education, in their official and individual | ) | |
| capacities, | ) | |
| | ) | |
| Defendants. | ) | |

### ORDER[1]

Just before this case's bench trial, the parties reached a settlement in the form of a stipulated judgment. Under that settlement, Defendants Ryan Walters and Dan Isett agreed to pay Plaintiff Nexstar Media, Inc. d/b/a KFOR-TV and its reporters (collectively, KFOR) nominal damages of $17.91[2] and provide the local media outlet with newsgathering access at certain events.

Absent from the stipulated judgment, however, was any agreement on attorney fees or costs. KFOR now moves for both—specifically, $366,044.60 in attorney fees and $10,550.14 in costs. *See* (KFOR's Mot.) [Doc. No. 59]. Defendants responded in opposition,[3] (Defs.' Resp.) [Doc. No. 61], and KFOR replied, [Doc. No. 64].

For the reasons that follow, the Court grants in part and denies in part KFOR's motion.

---

[1] All page citations in this Order refer to the Court's CM/ECF pagination.

[2] This figure is symbolic of the First Amendment's ratification in 1791.

[3] Defendants also moved for an evidentiary hearing on KFOR's motion. The Court addresses that request below.

I.    **Background**

On September 23, 2024, KFOR filed this civil rights action under 42 U.S.C. § 1983, alleging that Walters—Oklahoma's Superintendent of Public Instruction and chief executive officer of the Oklahoma State Department of Education (OSDE)—and Isett, OSDE's press secretary, violated its First Amendment newsgathering rights by blocking its reporters from attending meetings of the State Board of Education (Board) and follow-up press conferences at the State Capitol.[4] In its complaint, KFOR sought an injunction barring Defendants from excluding it going forward, a declaratory judgment to the same effect, nominal damages of $17.91, and attorney fees and costs.

That same day, hoping to secure access to an imminent Board meeting and press conference, KFOR moved for a temporary restraining order (TRO) and preliminary injunction. Two days later, just hours after a hearing attended by both sides, the Court granted a TRO and set the matter for a preliminary injunction hearing. *See Nexstar Media, Inc. v. Walters*, ___ F. Supp. 3d ___, No. CIV-24-980-J, 2024 WL 5679196, at *4 (W.D. Okla. Sept. 25, 2024).

The parties then jointly moved to consolidate that hearing with a trial on the merits and asked that trial occur in December 2024. The Court granted the motion, setting trial for December 11, 2024, and establishing deadlines for injunction briefing, discovery, and submission of witness and exhibit lists.

---

[4] The First Amendment includes a limited but recognized right to gather news. *See Houchins v. KQED, Inc.*, 438 U.S. 1, 11 (1978) (observing that the First Amendment includes an "undoubted right to gather news from any source by means within the law" (internal quotation marks omitted)); *Okla. Hosp. Ass'n v. Okla. Publ'g Co.*, 748 F.2d 1421, 1425 (10th Cir. 1984) ("Although it is true that the Supreme Court has recognized that newsgathering does warrant some First Amendment protection, that right is not unlimited[.]" (internal citation omitted)).

On the morning of trial, the parties advised that they were on the verge of a settlement. With additional time, they resolved the core of their dispute through an agreed final judgment and permanent injunction. *See* (Agreed Final J. and Permanent Inj.) [Doc. No. 58]. In it, Defendants agreed to

- "[g]rant access for KFOR to all . . . [B]oard meetings, press conferences, gaggles, or any other meetings held in which other news media are given nonexclusive access,"

- "[g]rant KFOR's access to the RSVP notices OSDE sends to journalists prior to each meeting,"

- place KFOR on the "email distribution list for all OSDE press releases and/or notifications related to OSDE activities,"

- "[g]rant KFOR's access to all OSDE 'statements' issued to members of the general press in response to daily press inquiries,"

- "[r]e-establish the media line for journalists wishing to attend . . . [B]oard meetings, subject to security concerns," and

- "pay [KFOR] nominal damages in the amount of $17.91 by check made payable."

*Id.* at 2–3. The parties also agreed that this Court should retain continuing jurisdiction to enforce the judgment, which the undersigned judge signed and entered that same day. *See id.* at 3, 5.

Now, KFOR moves for an award of $366,044.60 in attorney fees and $10,550.14 in costs. *See* KFOR's Mot. at 6–21. Defendants, at their hardest line, argue that KFOR is entitled to nothing. *See* Defs.' Resp. at 8–13.

II.    **Legal Framework**

A.    **Attorney Fees Under 42 U.S.C. § 1988(b)**

KFOR filed this lawsuit under 42 U.S.C. § 1983, which "creates a private right of action to vindicate violations of 'rights, privileges, or immunities secured by the Constitution and laws' of the United States." *Rehberg v. Paulk*, 566 U.S. 356, 361 (2012) (quoting 42 U.S.C. § 1983). When a party "prevail[s]" in such an action, federal law authorizes the district court to award a "reasonable attorney[] fee." 42 U.S.C. § 1988(b). "[U]nless special circumstances would render such an award unjust," "a prevailing plaintiff should ordinarily recover an attorney[] fee." *Hensley v. Eckerhart*, 461 U.S. 424, 429 (1983) (internal quotation marks omitted); *see also N.Y. Gaslight Club, Inc. v. Carey*, 447 U.S. 54, 68 (1980) ("[T]he court's discretion to deny a fee award to a prevailing plaintiff is narrow.").

Absent such special circumstances, then, a district court must resolve two primary questions under § 1988(b): (1) whether the requesting party prevailed, and (2) what fee is reasonable.

1.    **Prevailing Party**

"[N]o fee award is permissible until the plaintiff has crossed the 'statutory threshold' of prevailing party status." *Tex. State Tchrs. Ass'n v. Garland Indep. Sch. Dist.*, 489 U.S. 782, 789 (1989) (quoting *Hensley*, 461 U.S. at 433). "[F]or the purposes of § 1988(b), a plaintiff 'prevails' when a court grants enduring judicial relief that constitutes a 'material alteration of the legal relationship of the parties.'" *Lackey v. Stinnie*, 145 S. Ct. 659, 668 (2025) (quoting *Tex. State Tchrs.*, 489 U.S. at 792–793). That relief may take the form of nominal damages, *see id.* (citing *Farrar v. Hobby*, 506 U.S. 103, 112 (1992)), a "final victory on a material even if not predominant claim," *id.* (citing *Tex. State Tchrs.*, 489 U.S. at 791–93), or even a "settlement materially altering

4

the legal relationship of the parties," *Bell v. Bd. of Cnty. Comm'rs of Jefferson Cnty.*, 451 F.3d 1097, 1102 (10th Cir. 2006) (citing *Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Hum. Res.*, 532 U.S. 598, 602–04 (2001)).

To qualify, however, a settlement must "bear . . . the marks of a consent decree." *Id.* at 1103; *accord Sanchez v. Bd. of E. N.M.*, 361 F. App'x 980, 983 (10th Cir. 2010) (unpublished) ("explain[ing] that, absent a judgment on the merits or a formal consent decree, a private settlement agreement must bear the marks of a consent decree in order to confer prevailing party status on a plaintiff"). A settlement does so when the court (1) incorporates it into an order, (2) signs or otherwise formally approves its terms, and (3) retains jurisdiction to enforce the parties' obligations. *See Bell*, 451 F.3d at 1103 ("[I]f a court does not incorporate a private settlement into an order, does not sign or otherwise provide written approval of the settlement's terms, and does not retain jurisdiction to enforce performance of the obligations assumed by the settling parties, the settlement 'does not bear any of the marks of a consent decree' and does not confer prevailing party status on the party whose claims have been compromised.").

## 2.    Reasonableness

"The most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate, which produces the so-called 'lodestar amount.'" *Valdez v. Macdonald*, 66 F.4th 796, 836 (10th Cir. 2023) (internal quotation marks omitted). "Once an applicant for a fee has carried the burden of showing that the claimed rate and number of hours are reasonable, the resulting product is presumed to be a reasonable fee as contemplated by Section 1988." *Cooper v. Utah*, 894 F.2d 1169, 1171 (10th Cir. 1990).

"To determine what constitutes a reasonable hourly rate for each person who worked on the case, the district court considers the prevailing market rate for similar services by lawyers of reasonably comparable skill, experience, and reputation in the relevant community including experience in civil rights or analogous litigation." *Valdez*, 66 F.4th at 836 (brackets and internal quotation marks omitted). The party requesting fees should provide evidence of the prevailing market rate. *See Lippoldt v. Cole*, 468 F.3d 1204, 1224 (10th Cir. 2006). "If the district court does not have adequate evidence of prevailing market rates for attorney fees, then it may, in its discretion, use other relevant factors, including its own knowledge, to establish the rate." *Id.* at 1225 (internal quotation marks omitted); *see also Metz v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 39 F.3d 1482, 1493 (10th Cir. 1994) (noting that a judge "may turn to her own knowledge of prevailing market rates as well as other indicia of a reasonable market rate" (internal quotation marks omitted)).

"The first step in setting a rate of compensation for the hours reasonably expended is to determine what lawyers of comparable skill and experience practicing in the area in which the litigation occurs would charge for their time." *Ramos v. Lamm*, 713 F.2d 546, 555 (10th Cir. 1983), *overruled in part on other grounds by Pennsylvania v. Del. Valley Citizens' Council for Clean Air*, 483 U.S. 711 (1987); *see also Ad Astra Recovery Servs., Inc. v. Heath*, No. 18-1145-JWB-ADM, 2020 WL 4346965, at *7 (D. Kan. July 29, 2020) ("The Tenth Circuit has described the relevant community as the area in which the litigation occurs or the area in which the court sits." (internal quotation marks omitted)). Indeed, "[u]nless the subject of the litigation is so unusual or requires such special skills that only an out-of-state attorney possesses, the fee rates of the local area should be applied even when the lawyers seeking fees are from another area." *Lippoldt*, 468 F.3d at 1225 (internal quotation marks omitted).

6

When evaluating the reasonableness of the hours expended, a district court should approach the "inquiry much as a senior partner in a private law firm would review the reports of subordinate attorneys when billing clients." *Robinson v. City of Edmond*, 160 F.3d 1275, 1281 (10th Cir. 1998) (ellipses and internal quotation marks omitted). That approach requires the exercise of "billing judgment"—the "winnowing [of] the hours actually expended down to the hours reasonably expended." *Case v. Unified Sch. Dist. No. 233*, 157 F.3d 1243, 1250 (10th Cir. 1998). Ultimately, the "overriding consideration" is "whether the attorney's hours were 'necessary' under the circumstances."[5] *Robinson*, 160 F.3d at 1281; *see also Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 703 F. Supp. 2d 1243, 1248 (D. Colo. 2010) ("Time is reasonably expended on the litigation when it is 'useful and of a type ordinarily necessary to secure the final result obtained from the litigation.'" (quoting *Del. Valley Citizens' Council*, 478 U.S. at 557)).

Calculation of the lodestar "produces a presumptively reasonable fee that may [only] in rare circumstances be adjusted to account for the presence of special circumstances." *Anchondo v. Anderson, Crenshaw & Assocs., LLC*, 616 F.3d 1098, 1102 (10th Cir. 2010) (citing *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 552 (2010)). "In *Perdue*, the Supreme Court identified only three situations where fee enhancement may be justified: (1) when 'the hourly rate employed in the lodestar calculation does not adequately measure the attorney's true market value'; (2) 'if the attorney's performance includes an extraordinary outlay of expenses and the litigation is exceptionally protracted'; and (3) when 'an attorney's performance involves exceptional delay in the payment of fees.'" *In re Mkt. Ctr. E. Retail Prop., Inc.*, 730 F.3d 1239, 1247–48 (10th Cir.

---

[5] In making that determination, courts typically consider several factors: "(1) whether the tasks being billed 'would normally be billed to a paying client,' (2) the number of hours spent on each task, (3) 'the complexity of the case,' (4) 'the number of reasonable strategies pursued,' (5) 'the responses necessitated by the maneuvering of the other side,' and (6) 'potential duplication of services' by multiple lawyers." *Robinson*, 160 F.3d at 1281 (quoting *Ramos*, 713 F.2d at 554).

2013) (quoting *Perdue*, 559 U.S. at 554–56)). "[T]he burden of proving that an enhancement is necessary must be borne by the fee applicant" and must be supported by "specific evidence that supports the award." *Perdue*, 559 U.S. at 553 (internal quotation marks omitted).

### 3.    *Johnson* Factors

In *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717–19 (5th Cir. 1974), the Fifth Circuit identified twelve factors for courts to consider in determining the reasonableness of an attorney fee.[6]   Courts have long looked to these factors when evaluating fee requests.  *See Spencer v. Cent. Servs., LLC*, No. CCB–10–03469, 2012 WL 142978, at *2 (D. Md. Jan. 13, 2012) (observing that "[c]ourts historically have assessed the reasonableness of fee petitions with respect to the . . . *Johnson* factors").  And both sides cite them to support their fee positions.  *See* KFOR's Mot. at 10 ("In this case, the [*Johnson*] lodestar factors, as well as additional factors that justify a multiplier, support an attorneys' fees award of $366,044.60."); Defs.' Resp. at 17 ("Not a single one of th[e] [*Johnson*] factors warrants a lodestar multiplier in the present case.").

But the Supreme Court has since cast doubt on *Johnson*'s continued utility in § 1988 cases. In *Perdue*, the Court described the *Johnson* framework as merely "[o]ne possible method" that "gave very little actual guidance" and, with its "series of sometimes subjective factors[,] . . . produced disparate results."  559 U.S. at 550–51 (internal quotation marks omitted).  The Tenth Circuit echoed that view in *Anchondo*, stating that *Perdue* "significantly marginalize[d] the twelve-

---

[6] Those factors are: (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill required to perform the service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorney; (10) the undesirability of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.  *See Johnson,* 488 F.2d at 717–19.

factor *Johnson* analysis" and "clearly embrace[d] the lodestar approach as the preferable alternative to the *Johnson* analysis."  616 F.3d at 1103.

So while neither the Supreme Court nor the Tenth Circuit has declared the *Johnson* factors irrelevant, "it has only become clearer that the lodestar determination is primary and that the propriety of such a determination is not automatically called into doubt merely because the trial court did not expressly discuss the *Johnson* factors."  *Id.* at 1104; *see also Belanger v. Allstate Fire & Cas. Ins. Co.*, No. 19-317 WJ/SCY, 2024 WL 4850334, at *18 (D.N.M. Nov. 21, 2024) ("[T]he Supreme Court and Tenth Circuit have indicated that the *Johnson* factors should not carry great weight, if any, in the lodestar context.").

### B.    Costs

In awarding costs, federal law "distinguish[es] between those that are taxable under 28 U.S.C. § 1920 and those that are [not]."  *Valdez*, 66 F.4th at 837.  Federal Rule of Civil Procedure 54(d) provides that "costs—other than attorney[] fees—should be allowed to the prevailing party."  Fed. R. Civ. P. 54(d)(1).  "28 U.S.C. § 1920 defines the term 'costs' as used in Rule 54(d)."  *Valdez*, 66 F.4th at 837 (brackets and internal quotation marks omitted).  These "[t]axable costs are limited to relatively minor, incidental expenses as is evident from § 1920, which lists such items as clerk fees, court reporter fees, expenses for printing and witnesses, expenses for exemplification and copies, docket fees, and compensation of court-appointed experts."  *Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 573 (2012).

A court may award "other out-of-pocket expenses" to the prevailing party under § 1988(b) as part of a fee award.  *Valdez*, 66 F.4th at 837.  To qualify, the expenses must (1) "not [be] absorbed as part of law firm overhead [and be of a type] normally billed to a private client," and (2) be "reasonable."  *Jane L. v. Bangerter*, 61 F.3d 1505, 1517 (10th Cir. 1995).

III.    **Discussion**

   A.    **Defendants' Request for a Hearing**

As a preliminary matter, the Court denies Defendants' request for an evidentiary hearing. *See* [Doc. No. 62].  In their brief motion, Defendants broadly argue that the "costs, fees, and time [KFOR] submitted are exorbitant and unnecessary, given the facts of this case and the expedited resolution."  *Id.* at 2.

 "[A]n evidentiary hearing is generally preferred, if not required, when *factual disputes* exist in connection with a request for attorney fees and costs and those disputes cannot be resolved without a hearing."  *Michael A. Cramer, MAI, SRPA, Inc. v. United States*, 47 F.3d 379, 383 (10th Cir. 1995) (emphasis added).  But Defendants point to no such dispute here.  They identify no specific time entry as fictitious, no task as unperformed, and no credential as misrepresented. Rather, their objections concern the legal reasonableness of the hours billed and the rates requested.

The Court finds the existing record more than sufficient to resolve KFOR's motion.  Given the documentation submitted and the Court's familiarity with the case, no hearing is necessary. *See Robinson*, 160 F.3d at 1286 ("[T]here is no need for an evidentiary hearing in a[n] attorney's fees case when a record has been fully developed through briefs, affidavits, and depositions."); *Hutchinson v. Beckworth*, 474 F. App'x 736, 740 (10th Cir. 2012) (unpublished) ("[T]he decision to rely upon affidavits and the record of a case rather than to conduct an evidentiary hearing lies within the district court's discretion.").

   B.    **KFOR's Attorney Fees**

      1.    **Eligibility for Fee Shifting Under § 1988(b)**

At the threshold, Defendants argue that this case presents a special circumstance rendering *any* fee award unjust.  Because KFOR is a well-resourced news outlet that can "afford to hire any

lawyer of its choosing," Defendants contend that it is not the type of plaintiff Congress intended to benefit when it enacted § 1988(b). Defs.' Resp. at 9. In support, they cite legislative history highlighting Congress's concern with enabling individuals of limited means to vindicate their civil rights. *See id.* at 8–9 (citing S. Rep. No. 94-1011, at 2 (1976), *reprinted in* 1976 U.S.C.C.A.N. 5908, 5910).

Congress may well have been mindful of the financial barriers faced by less affluent plaintiffs when crafting § 1988, yet it stopped short of limiting fee awards to them alone. The statute gives courts discretion to award reasonable attorney fees to the prevailing party in "*any* action or proceeding to enforce" § 1983. 42 U.S.C. § 1988(b) (emphasis added). Nothing in the text distinguishes between plaintiffs based on their ability to pay. And for good reason. The fee-shifting provision "has purposes other than encouraging lawyers to take on a case, such as penalizing obstructive litigation by civil rights defendants and generally deterring civil rights violations." *Jones v. Wilkinson*, 800 F.2d 989, 991 (10th Cir. 1986) (internal quotation marks omitted).

In the end, Defendants cite no case, binding or otherwise, holding that a plaintiff's financial status is a special circumstance justifying the wholesale denial of fees under § 1988. That is no surprise: the Tenth Circuit, along with several of its sister circuits, has reached the opposite conclusion. *See id.* ("[T]he ability of a party to bring a suit without a fee award is not a special circumstance rendering a fee award unjust."); *Democratic Party of Wash. State v. Reed*, 388 F.3d 1281, 1285 (9th Cir. 2004) ("People and entities whose civil rights have been unconstitutionally abridged are generally entitled to attorneys' fees under § 1988 regardless of their ability to pay their attorneys."); *Bills v. Hodges*, 628 F.2d 844, 847 (4th Cir. 1980) ("We think the plaintiffs' ability to pay attorneys' fees is not a special circumstance that would render an award of fees

11

unjust."); *Int'l Oceanic Enters., Inc. v. Menton*, 614 F.2d 502, 503 (5th Cir. 1980) ("The plaintiff's ability to pay is not a special circumstance sufficient to render an award under § 1988 unjust.").

### 2.    Prevailing Party Status

Next, Defendants argue that KFOR is not entitled to attorney fees because it did not "prevail" in this action.  *See* Defs.' Resp. at 9–13.  They make two points.  First, they emphasize the absence of an adjudication on the merits or any admission of a constitutional violation.  *See id.* at 9–12.  Second, they contend that even if KFOR technically prevailed, its success was so "de minimis" that no fee award is warranted.  *See id.* at 12–13.

The Court finds both arguments unpersuasive.  To start, the Supreme Court has never limited prevailing party status to those who win on the merits.  In *Buckhannon*, the Supreme Court held that a plaintiff prevails under § 1988 if it "obtain[s] a judgment on the merits, a consent decree, or some other settlement materially altering the legal relationship of the parties."  *Bell*, 451 F.3d at 1102 (citing *Buckhannon*, 532 U.S. at 602–604).  Any of the three will suffice, with or without an admission of liability: "*Buckhannon* does not require explicit vindication on the merits of the claim in addition to the parties' settlement agreement," and though settlement agreements and consent decrees "do[] not always include an admission of liability on the merits by the defendant, [they] nonetheless meet[] the test."  *Smalbein ex rel. Est. of Smalbein v. City of Daytona Beach*, 353 F.3d 901, 907 (11th Cir. 2003) (emphasis omitted); *see also Buckhannon*, 532 U.S. at 604 ("In addition to judgments on the merits, we have held that settlement agreements enforced through a consent decree may serve as the basis for an award of attorney's fees.  Although a consent decree does not always include an admission of liability by the defendant, it nonetheless is a court-ordered change in the legal relationship between the plaintiff and the defendant." (brackets, internal citations, and quotation marks omitted)).

Nor does the Court agree that KFOR's success was merely "technical" or "*de minimis*." In *Farrar*, the Supreme Court held that "[a]lthough the 'technical' nature of a nominal damages award . . . does not affect the prevailing party inquiry, it does bear on the propriety of fees awarded under § 1988." 506 U.S. at 114. As a result, "[w]hen a plaintiff recovers *only nominal damages* because of his failure to prove an essential element of his claim for monetary relief, the only reasonable fee is usually no fee at all." 506 U.S. at 115 (emphasis added) (internal citation omitted).

Justice O'Connor, concurring, agreed that the "*de minimis* or technical" nature of a victory is relevant to the fee determination. *See id.* at 117 (O'Connor, J., concurring). But she emphasized that "not . . . *all* nominal damages awards are *de minimis*." *Id.* at 121 (emphasis in original). As she put it: "Nominal relief does not necessarily a nominal victory make." *Id.* She then outlined several factors for distinguishing nominal recoveries that justify fees from those that do not. *See id.* at 121–22.

The Tenth Circuit has considered those factors in evaluating whether a party's success is merely technical. *See, e.g.*, *Zinna v. Congrove*, 680 F.3d 1236, 1239 (10th Cir. 2012). And had KFOR "obtained only nominal damages," it would be "incumbent" on this Court to apply them. *Sinajini v. Bd. of Educ. of San Juan Cnty. Sch. Dist.*, 53 F. App'x 31, 38 (10th Cir. 2002) (unpublished). But KFOR obtained more. Through the stipulated judgment, it secured the core relief sought in its complaint: a permanent injunction guaranteeing its access to key OSDE events. *See* Agreed Final J. and Permanent Inj. at 2–3. That is not a *de minimis* result.[7] *See Lefemine v.*

---

[7] Defendants attempt to downplay the significance of KFOR's relief by invoking language from *Dahlem ex rel. Dahlem v. Board of Education of Denver Public Schools*, 901 F.2d 1508 (10th Cir. 1990). There, the Tenth Circuit stated that "[f]or the purpose of deciding whether a plaintiff is a prevailing party, a preliminary injunction is considered a decision on the merits so long as it represents an unambiguous indication of probable success on the merits, and not merely a

*Wideman*, 568 U.S. 1, 11 (2012) (per curiam) ("[W]e have repeatedly held that a[] [permanent] injunction or declaratory judgment, like a damages award, will usually satisfy that [prevailing party] test.").

In short, KFOR prevailed—and not in any merely technical sense. The only question left is how much it should recover.

### 3.    Lodestar

#### a.    Hourly Rates

Again, awarding attorney fees generally starts and ends with calculating the "lodestar amount—the number of hours reasonably expended . . . multiplied by a reasonable hourly rate." *Stenson v. Edmonds*, 86 F.4th 870, 879 (10th Cir. 2023). As the party requesting fees, KFOR "carrie[s] the burden of showing that the claimed rate and number of hours are reasonable." *Cooper*, 894 F.2d at 1171.

In this case, three attorneys entered appearances on KFOR's behalf: Robert Nelon of the Oklahoma-based law firm Hall Estill, and Courtney Corbello and Charles Miller of the Washington, D.C.-based Institute for Free Speech (IFS). Each submitted an affidavit attesting to their qualifications, along with time records detailing the legal services performed. Nelon billed $33,752.50 for 58.5 hours of work at an approximate hourly rate of $575.[8] *See* KFOR's Mot., Ex.

---

maintenance of the status quo." *Id.* at 1511 (alterations and internal quotation marks omitted). Defendants seize on that framing, insisting that "the only relief [KFOR] gained largely maintained the status quo." Defs.' Resp. at 12. But *Dahlem* addressed a different issue entirely: "whether a plaintiff who obtains a *preliminary* injunction . . . is a prevailing party in the district court." 901 F.2d at 1511 (emphasis added). KFOR, by contrast, obtained permanent relief. *See* Agreed Final J. and Permanent Inj. at 2–3.

[8] Though Nelon primarily billed at $575 per hour, some entries reflect a lower rate. For instance, on November 15, 2024, he billed 2.6 hours for a total of $1,265, reflecting an effective hourly rate of $486. *See* KFOR's Mot., Ex. 3 at 7. Nelon's materials also include work performed by Alexandra Speed, an associate attorney at Hall Estill. She billed 3.9 hours at a rate of $225 per

3 at 6–8.  Corbello billed $210,386 for 321.2 hours at $655 per hour.  *See id.*, Ex. 1 at 21, 24–31.

And Miller billed $121,028.60 for 149.05 hours at $812 per hour.  *See id.*, Ex. 2 at 17, 26–30.  In

total, KFOR seeks a fee award of $366,044.60.  *See id.* at 6.

### i.    Nelon

Nelon, an "of counsel" attorney for Hall Estill, served as local counsel in this case.  *See id.*,

Ex. 3 at 1.  He brings roughly 54 years of litigation experience, including 47 years assisting media

clients with "pre-publication counseling and review; defense of defamation, privacy, and related

claims; litigation to obtain access to public places and documents; defense of subpoenas issued to

media outlets; and the presentation of anti-SLAPP motions under the Oklahoma Citizens

Participation Act."  *Id.*, Ex. 3 at 1.  He has also advocated pro bono and as an amicus for free

speech and press advocacy organizations.  *See id.*, Ex. 3 at 2.  Nelon's reputation as a premier First

Amendment litigator is well established.  *See id.*, Ex. 3 at 2 ("I have been recognized each year for

several years as a Best Lawyer in America in First Amendment Law and Litigation—First

Amendment and an Oklahoma Super Lawyer in First Amendment as well as in Media and

Advertising Law.").

According to Nelon, Hall Estill sets his hourly rate based on his experience level and

practice area.  *See id.*, Ex. 3 at 4.  While $575 falls on the higher end for Oklahoma City, that alone

does not render it unreasonable. The relevant inquiry is whether the rate aligns with "those

prevailing in the community for similar services by lawyers of reasonably comparable skill,

experience, and reputation."  *United Phosphorus, Ltd. v. Midland Fumigant, Inc.*, 205 F.3d 1219,

1234 (10th Cir. 2000) (internal quotation marks omitted).

---

hour for preparing for and attending a deposition.  *See id.*, Ex. 3 at 7.  Though she never entered
an appearance in this case, that is not required for a court to award fees for her work. *See Case*,
157 F.3d at 1252.  The Court finds both her hourly rate and time expended reasonable.

In *McCraw v. City of Oklahoma City*, a judge in this district approved a $500 hourly rate for a First Amendment litigator with "exceptional" credentials. No. CIV-16-0352-HE, 2021 WL 12351656, at *2 (W.D. Okla. Aug. 23, 2021). That attorney, Professor Joseph Thai, is "considered one of the leading experts in the country on First Amendment law." *Id.* Based on his background, the court suggested that $500 "f[ell] on the low end of an appropriate rate." *Id.*

Defendants invoke Thai's *McCraw* declaration as evidence that the hourly rates KFOR seeks for Nelon, Corbello, and Miller are unreasonable. *See* Defs.' Resp. at 30, Ex. 2 at 2–14. Thai, a Harvard Law graduate, clerked for both the Tenth Circuit and the United States Supreme Court. *See id.*, Ex. 2 at 3. Since then, he has built a distinguished career as a litigator, law professor, and nationally recognized expert on the First Amendment. *See id.*, Ex. 2 at 3–8. Even that may understate his expertise.

Though their paths differ, Nelon's depth of experience places him in the same general realm. Few attorneys appearing in this district possess comparable longevity and focus in First Amendment litigation. Even Defendants concede that Nelon "appears . . . to have a significant background in media First Amendment rights and in litigation involving press speech First Amendment cases." *Id.* at 30 n.18.

Still, the Court is unaware of any decision in this district or another within Oklahoma finding a $500 hourly rate in line even with the top tier of the Oklahoma City legal market. That remains true even in cases involving some of the most experienced civil rights attorneys in the state. *See McCraw*, 2021 WL 12351656, at *2; *Ellis v. Sheriff*, No. 4:17-cv-00325-CRK-CDL, 2024 WL 866352, at *3 (N.D. Okla. Feb. 29, 2024) (reducing requested hourly rate of $500 to $425 for 23-year Tulsa attorney with "specialized experience in civil rights litigation"); *Inst. for Justice v. Laster*, No. CIV-19-858-D, 2022 WL 17903784, at *5–6 (W.D. Okla. Dec. 23, 2022)

(finding $475 hourly rate in First Amendment case in line with Oklahoma City rates for experienced partner); *Busby v. City of Tulsa*, No. 11-CV-447-JED-JFJ, 2018 WL 7286180, at *3 (N.D. Okla. Oct. 23, 2018) (approving $400 hourly rate for veteran civil rights litigator with over 40 years of experience after observing that the mean rate for Tulsa attorneys with more than 25 years of experience was around $300–$350 per hour); *cf. Brown v. Flowers*, No. 17-CV-347-EFM, 2023 WL 2955883, at *4 (E.D. Okla. Apr. 14, 2023) (suggesting hourly rate of $395 aligned with rates of the "most experienced civil rights litigators in Oklahoma").

With these cases and Nelon's materials in mind, the Court approves an hourly rate of $500. This figure not only aligns with prevailing market rates but reflects Nelon's stature as one of Oklahoma's foremost First Amendment litigators.

### ii.     Corbello and Miller

As for Corbello and Miller, KFOR asks the Court to apply their respective Washington, D.C. rates of $655 and $812.  *See* KFOR's Mot. at 13.  Corbello and Miller arrive at these figures under the "Fitzpatrick Matrix," which outlines prevailing market rates for complex federal litigation in the District of Columbia based on years of experience.[9]  *See id.*, Ex. 1 at 19–20; *id.*, Ex. 2 at 17.  They argue that these out-of-district rates are warranted given the novelty and difficulty of the case, the specialized nature of First Amendment press-access litigation, and the lack of comparable local counsel.  *See id.*, Ex. 1 at 7–9, 19–20; *id.*, Ex. 2 at 13–14, 16.

Defendants counter that Corbello and Miller lack the expertise necessary to justify their retention in this Oklahoma case, particularly given the availability of capable local counsel.  *See*

---

[9] As one court explained: "The Fitzpatrick Matrix is a schedule of hourly fees based on years of attorney experience developed by the U.S. Attorney's Office for the District of Columbia. It has been developed to provide a reliable assessment of fees charged for complex federal litigation in th[at] District."  *Louise Trauma Ctr. LLC v. U.S. Dep't of Homeland Sec.*, No. 1:20-cv-01128 (TNM), 2023 WL 3478479, at *4 n.3 (D.D.C. May 16, 2023).

Defs.' Resp. at 27–30.  They point to attorneys like Thai and Nelon as examples.  *See id.* at 29–31 and n.18.  They also cite decisions from both within and outside this district as evidence that the "proposed hourly rates are grossly disproportionate to awards in similar cases."[10]  *Id.* at 35.

Corbello earned her law degree in 2015.  *See* KFOR's Mot., Ex. 1 at 14.   Though still relatively early in her legal career, she has developed a solid record litigating civil rights cases.  *See id.*, Ex. 1 at 14–17.  As for her First Amendment work, she reports "extensive" experience and points to several cases from her time at the Texas Attorney General's Office, along with several others since joining IFS in 2023.[11]  *See id.*, Ex. 1 at 17.

Miller, a 24-year attorney, spent the early part of his career in private practice focusing on corporate litigation, election law, and expedited litigation.  *See id.*, Ex. 2 at 1–2.  He later served briefly as a state appellate judge and as Ohio's Deputy Attorney General for Major Litigation.  *See id.*, Ex. 2 at 2–3.  Since joining IFS in 2023, he has focused on "campaign finance, political free speech, and media," filing cases in federal courts across the country.  *See id.*, Ex. 2 at 4.  While some matters remain pending, he reports having "prevailed" in Connecticut, Maine, Iowa, Kansas, New York and Oklahoma.  *Id.*, Ex. 2 at 4.

Corbello and Miller undoubtedly served as capable advocates and brought meaningful experience to bear on their client's behalf.  But for the Court to apply their elevated Washington, D.C. rates, KFOR must show that the subject of the litigation was "so unusual or require[d] such

---

[10] Defendants do not squarely address the legal standard that governs when out-of-district rates may be awarded.  Instead, they embed their rate-related objections within broader arguments against a lodestar enhancement and the fee request as a whole.  *See* Defs.' Resp. at 16–32.  Still, it remains KFOR's burden—not Defendants'—to establish the reasonableness of the hourly rates claimed.  *Cooper*, 894 F.2d at 1171.

[11] While Corbello does not state her exact start date with IFS, Defendants assert that she began working there in 2023.  *See* Defs.' Resp. at 9 n.3.  KFOR does not dispute that.

special skills that only an out-of-state attorney possesse[d]." *Lippoldt*, 468 F.3d at 1225 (internal quotation marks omitted).  KFOR has not met that burden.

In support of her higher rate, Corbello states that press-access cases are rare in Oklahoma, and that she was unable to find any Oklahoma federal court decision discussing the issues presented in this case.  *See* KFOR's Mot., Ex. 1 at 7.  She adds that "there are only a handful of law firms that appear to handle First Amendment issues, even fewer that handle First Amendment cases for journalists[,] and even fewer still who handle First Amendment cases for journalists being denied equal access to governmental forums."  *Id.*, Ex. 1 at 7.  That may be true.  But these types of cases are rare everywhere, not just in Oklahoma.  Indeed, Corbello appears to have litigated only two other press-access cases during her time at IFS.  *See id.*, Ex. 1 at 17.  Miller, for his part, merely notes that "[t]his case is one of a series of media cases" he has litigated.  *See id.*, Ex. 2 at 5.

Moreover, while the case may have been novel in context, the legal issues were not especially complex.  Defendants effectively admitted they were barring KFOR from government events open to other media outlets because they viewed the station as "fake news."  *See Nexstar Media*, 2024 WL 5679196, at *1–4.  From the start, their position was difficult to defend.  *See id.* The Court is confident that local attorneys familiar with either First Amendment law or broader civil rights litigation could have ably prosecuted KFOR's case.

And KFOR had such an attorney in Nelon.  He is a premier First Amendment litigator based in Oklahoma City and assisted in virtually all phases of the litigation.  *See* KFOR's Mot., Ex. 3 at 3.  When unavailable, he delegated tasks to a less experienced Hall Estill associate.  *See id.*, Ex. 3 at 2.

In short, the Court concludes that this case was neither "so unusual" nor one requiring "such special skills that only an out-of-state attorney possesse[d]." *Lippoldt*, 468 F.3d at 1225 (internal quotation marks omitted). Accordingly, the Court will apply rates for Corbello and Miller consistent with "the prevailing market rate for similar services by lawyers of reasonably comparable skill, experience, and reputation in the relevant community including experience in civil rights or analogous litigation." *Valdez*, 66 F.4th at 836 (brackets and internal quotation marks omitted). This conclusion reflects not a critique of their qualifications or contributions, but rather a recognition that courts rarely depart from local rates. *See Ramos*, 713 F.2d at 555 ("In every major metropolitan area there are a substantial number of lawyers who possess the skill to handle all but the most unusual civil rights cases.").

Even in the local market, KFOR maintains that reasonable hourly rates for Corbello and Miller are $436 and $541, respectively. *See* KFOR's Mot. at 14. But even those figures exceed what the Court finds to be reasonable.

In *Brown*, the plaintiff requested approval of a $395 hourly rate. 2023 WL 2955883, at *3. The court acknowledged that her attorney was "certainly an experienced litigator, with 23 years of litigation under his belt," but concluded he was "not among the most experienced civil rights litigators in Oklahoma, as his requested rate" implied. *Id.* at *4. Relying on its knowledge of prevailing rates for civil rights work in the Eastern District of Oklahoma, the court reduced the hourly rate to $325. *Id.*

In *Ellis*, a civil rights case in Tulsa, the plaintiff requested hourly rates of $550 and $500 for two lead attorneys. 2024 WL 866352, at *3. Both had decades of experience and substantial civil rights expertise. *See id.* Still, drawing comparisons to a recent fee award in a similar case, the court reduced the rates to $450 and $425. *See id.* These figures, the court explained, more

accurately reflected prevailing rates for attorneys with comparable experience and specialization in the Tulsa market. *See id.*

Finally, in *Busby*, the plaintiff requested hourly rates of $350 and $400 for lead counsel, and $300 for a third attorney. 2018 WL 7286180, at * 3. The court described the lead attorneys as "among the most experienced civil rights litigators in Oklahoma," each with more than 40 years of practice. *See id.* The third attorney was a "seasoned civil litigator with over 17 years of experience, having represented plaintiffs in a number of complex civil rights actions." *Id.* at *4. The court approved all three rates, finding $400 and $350 to be at the high and middle ends, respectively, of the Tulsa market for attorneys with more than 25 years of experience, and $300 to be within the middle-to-high range for someone with 17 years of experience. *See id.* at *3–4.

With these cases and KFOR's supporting materials in mind, the Court finds hourly rates of $325 for Corbello and $425 for Miller appropriate. Both attorneys are capable advocates who provided valuable support throughout the litigation. Still, Corbello has roughly a decade of experience, only part of which has been in civil rights litigation. Miller, though more seasoned, has likewise devoted only a portion of his career to the field. Neither rises to the level of the most experienced civil rights litigators in the state. *See, e.g.*, *Peoria Tribe of Indians of Okla. v. Campbell*, No. 19-CV-581-TCK-JFJ, 2022 WL 3337276, at *2 (N.D. Okla. June 15, 2022) (approving $400 hourly rate for Norman, Oklahoma, attorney who "specializes in civil rights litigation" and has "over forty years of experience"). And in comparable cases involving attorneys with similar backgrounds, courts have declined to approve the kind of elevated rates Corbello and Miller now request. *See, e.g.*, *Ellis*, 2024 WL 866352, at *3.

Finally, KFOR asks the Court to apply an enhancement to Corbello's and Miller's hourly rates. *See* KFOR's Mot. at 15–17. "In *Perdue*, the Supreme Court identified only three situations

where fee enhancement may be justified: (1) when 'the hourly rate employed in the lodestar calculation does not adequately measure the attorney's true market value'; (2) 'if the attorney's performance includes an extraordinary outlay of expenses and the litigation is exceptionally protracted'; and (3) when 'an attorney's performance involves exceptional delay in the payment of fees.'"  *In re Mkt. Ctr.*, 730 F.3d at 1247–48 (quoting *Perdue*, 559 U.S. at 554–56)).  "[S]uch circumstances are indeed rare and exceptional, and require specific evidence that the lodestar fee would not have been adequate to attract competent counsel."  *Id.* at 1248.  The Court is not persuaded that this is one of those rare or exceptional cases warranting an enhancement.

### b.    Hours Expended

Having determined the reasonable hourly rates, the Court now turns to the number of hours reasonably expended.  As noted above, each attorney submitted time records detailing the hours worked and describing the tasks performed. Defendants do not dispute the clarity or general sufficiency of these records.  *See Hall v. Ford Motor Co.*, No. CIV-23-1018-J, 2025 WL 1321395, at *3 (W.D. Okla. Jan. 8, 2025) (explaining that "[c]alculation of the lodestar figure . . . hinges on the submission of 'meticulous, contemporaneous time records that reveal, for each lawyer for whom fees are sought, all hours for which compensation is requested and how those hours were allotted to specific tasks'" (quoting *Case*, 157 F.3d at 1250)).

Nor do Defendants challenge any specific time entry.  Instead, they broadly assert that it "defies credibility" for KFOR's counsel to have billed nearly 533 hours for a case that lasted only several months. Defs.' Resp. at 18.  By comparison, they cite other cases in which IFS billed fewer hours for litigation that spanned years.  *See id.* at 14–15, 18–19.  "To be sure, . . . Defendants do not suggest that the . . . attorneys . . . purposefully inflat[ed] the number of hours they expended."

*Id.* at 19.  But in their view, "attorneys cannot and should not be monetarily rewarded for their own inability to effectively manage their time."  *Id.*

As any reasonable observer would concede, this case was brief: only 79 days passed from filing to settlement.[12]  But that short window saw no shortage of litigation activity.  At the outset, KFOR sought a TRO requiring immediate judicial attention.  The parties then requested a trial in roughly two months, prompting expedited discovery and related deadlines. When Defendants demanded a jury trial in a case seeking only injunctive relief and nominal damages, the Court had to resolve, after full briefing, whether the Seventh Amendment entitled them to one.  It concluded it did not.  *See Nexstar Media, Inc. v. Walters*, No. CIV-24-980-J, 2024 WL 5679197, at *1–3 (W.D. Okla. Oct. 29, 2024).  Closer to trial, KFOR moved to exclude certain evidence—a motion the Court largely granted.  *See Nexstar Media, Inc. v. Walters*, No. CIV-24-980-J, 2024 WL 5680763, at *2–3 (W.D. Okla. Dec. 9, 2024).  And these are only the proceedings reflected on the docket; much of litigation happens off it.

A case's duration, moreover, is not a reliable barometer of its demands.  Some cases linger on their dockets for years with little substantive activity.  This was not that.  At least from KFOR's perspective, the case required sustained effort from start to finish.  The hours billed reflect that pace.

Still, while Defendants do not challenge any specific time entry, it remains KFOR's "burden to prove and establish the reasonableness of each dollar, each hour, above zero."  *Mares v. Credit Bureau of Raton*, 801 F.2d 1197, 1210 (10th Cir. 1986).  "To meet that burden, . . . lawyers [must] keep meticulous time records that 'reveal . . . all hours for which compensation is

---

[12] Miller's time records indicate that he started preparing for litigation around September 4, 2024, roughly three weeks before filing KFOR's complaint.  *See* KFOR's Mot., Ex. 2 at 26.

requested and how those hours were allotted to specific tasks.'" *Jane L.*, 61 F.3d at 1510 (quoting *Ramos*, 713 F.2d at 553). "The prevailing party must make a 'good-faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary.'" *Id.* (quoting *Hensley*, 461 U.S. at 434).

With these principles in mind, the Court has carefully reviewed the time records submitted by Nelon, Corbello, and Miller. These records are detailed enough to permit meaningful review. And having conducted that review, the Court finds that the hours generally appear necessary to meet the demands of the case. *See Robinson*, 160 F.3d at 1281 (explaining that the inquiry of whether hours were reasonably expended is governed by the "overriding consideration of whether the attorney's hours were 'necessary' under the circumstances").

One exception is time billed for "travel." As explained above, retaining out-of-state counsel was not necessary. In such cases, travel-related costs are generally not compensable. *See Ramos*, 713 F.2d at 559 ("[B]ecause there is no need to employ counsel from outside the area in most cases, we do not think travel expenses for such counsel between their offices and the city in which the litigation is conducted should be reimbursed. Departure from this rule should be made in unusual cases only."). This principle extends to travel time billed at an attorney's hourly rate. *See Utah Physicians for a Healthy Env't, Inc. v. Diesel Power Gear, LLC*, No. 2:17-CV-00032-RJS, 2021 WL 254268, at *10 (D. Utah Jan. 26, 2021) ("The court applies [the *Ramos* standard] to travel-related hours billed by out-of-state counsel because it is unreasonable for a prevailing party that could have obtained in-state representation to charge its opponent for time incurred strictly because they chose to hire out-of-state counsel.").

Reducing each attorney's hours to exclude travel time, the following totals remain:

- Robert Nelon: 58.5 hours at $500/hour, totaling $29,250.

24

- Alexandra Speed: 3.9 hours at $225/hour, totaling $877.50.

- Courtney Corbello: 288.8 hours at $325/hour, totaling $93,860.

- Charles Miller: 109.35 hours at $425/hour, totaling $46,473.75.

This results in a total fee award of $170,461.25, down from KFOR's requested amount of $366,044.60.

### C.    KFOR's Costs

Finally, KFOR requests $10,550.14 in costs. Most are travel-related expenses incurred by Corbello and Miller. *See* KFOR's Mot., Ex. 1 at 33. As explained above, these expenses are unreasonable. *See Ramos*, 713 F.2d at 559.

KFOR seeks to recover the remaining costs under 28 U.S.C. § 1920. Under this Court's Local Rules, however, a party seeking to recover costs under § 1920 must first comply with specific procedures, including submission to the Clerk of Court. *See* LCvR54.1. KFOR did not do so. Accordingly, the Court awards no costs.

## IV.    <u>Conclusion</u>

For the reasons above, the Court DENIES Defendants' request for an evidentiary hearing [Doc. No. 62] and GRANTS IN PART and DENIES IN PART KFOR's motion for attorney fees and costs [Doc. No. 59]. Specifically, the Court awards $170,461.25 in attorney fees and no costs.

IT IS SO ORDERED this 27th day of June, 2025.

BERNARD M. JONES
UNITED STATES DISTRICT JUDGE